## McNEIL *v.* DIRECTOR, PATUXENT INSTITUTION

No. 71–5144.   Argued April 20, 1972—Decided June 19, 1972

MARSHALL, J., delivered the opinion for a unanimous Court. DOUGLAS, J., filed a concurring opinion, *post*, p. 252.

*E. Barrett Prettyman, Jr.,* by appointment of the Court, 404 U. S. 1057, argued the cause for petitioner. With him on the briefs were *Peter F. Rousselot* and *Richard B. Ruge.*

*Henry R. Lord,* Deputy Attorney General of Maryland, argued the cause for respondent. With him on the brief were *Francis B. Burch,* Attorney General, and *Edward F. Borgerding, Donald R. Stutman, Josef Rosen-*

blatt, and *Harry. A. E. Taylor*, Assistant Attorneys General.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Edward McNeil was convicted of two assaults in 1966, and sentenced to five years' imprisonment. Instead of committing him to prison, the sentencing court referred him to the Patuxent Institution for examination, to determine whether he should be committed to that institution for an indeterminate term under Maryland's Defective Delinquency Law. Md. Ann. Code, Art. 31B (1971). No such determination has yet been made, his sentence has expired, and his confinement continues. The State contends that he has refused to cooperate with the examining psychiatrists, that they have been unable to make any valid assessment of his condition, and that consequently he may be confined indefinitely until he cooperates and the institution has succeeded in making its evaluation. He claims that when his sentence expired, the State lost its power to hold him, and that his continued detention violates his rights under the Fourteenth Amendment. We agree.

## I

The Maryland Defective Delinquency Law provides that a person convicted of any felony, or certain misdemeanors, may be committed to the Patuxent Institution for an indeterminate period, if it is judicially determined that he is a "defective delinquent." A defective delinquent is defined as

"an individual who, by the demonstration of persistent aggravated antisocial or criminal behavior, evidences a propensity toward criminal activity, and who is found to have either such intellectual deficiency or emotional unbalance, or both, as to clearly

demonstrate an actual danger to society so as to require such confinement and treatment, when appropriate, as may make it reasonably safe for society to terminate the confinement and treatment." Md. Ann. Code, Art. 31B, § 5.

Defective-delinquency proceedings are ordinarily instituted immediately after conviction and sentencing; they may also be instituted after the defendant has served part of his prison term. §§ 6 (b), 6 (c).[1] In either event, the process begins with a court order committing the prisoner to Patuxent for a psychiatric examination. §§ 6 (b), 6 (d). The institution is required to submit its report to the court within a fixed period of time. § 7 (a).[2] If the report recommends commitment, then a hearing must be promptly held, with a jury trial if requested by the prisoner, to determine whether he should be committed as a defective delinquent. § 8. If he is so committed, then the commitment operates to suspend the prison sentence previously imposed. § 9 (b).

In Murel v. Baltimore City Criminal Court, post, p. 355, several prisoners who had been committed

---

[1] But not after he has served all of it. The statute has always provided that no examination may be ordered or held if the person has been released from custody; since 1971 it has also prohibited the examination if the person is within six months of the expiration of sentence, § 6 (c), as amended in 1971. The State asserts that about 98% of the referrals to Patuxent are made immediately after conviction. Tr. of Oral Arg. 27; see Respondent's Brief 82 n. 33.

[2] The statute originally required the report to be submitted within six months, or before expiration of sentence, whichever later occurs. Since 1971, it has required a report within six months, or three months before expiration of sentence, whichever first occurs. § 7 (a), as amended in 1971. The state courts have construed the statute to permit extension of the allowable time, however, in the case of a noncooperative defendant who resists examination. State v. Musgrove, 241 Md. 521, 217 A. 2d 247 (1966); Mullen v. Director, 6 Md. App. 120, 250 A. 2d 281 (1969).

as defective delinquents sought to challenge various aspects of the criteria and procedures that resulted in their commitment; we granted certiorari in that case together with this one, in order to consider together these challenges to the Maryland statutory scheme. For various reasons we decline today to reach those questions, see *Murel, supra.* But Edward McNeil presents a much more stark and simple claim. He has never been committed as a defective delinquent, and thus he has no cause to challenge the criteria and procedures that control a defective-delinquency hearing. His confinement rests wholly on the order committing him for examination, in preparation for such a commitment hearing. That order was made, not on the basis of an adversary hearing, but on the basis of an *ex parte* judicial determination that there was "reasonable cause to believe that the Defendant may be a Defective Delinquent." [3] Petitioner does not challenge in this Court the power of the sentencing court to issue such an order in the first instance, but he contends that the State's power to hold him on the basis of that order has expired. He filed a petition for state post-conviction relief on this ground, *inter alia,* pursuant to Md. Ann. Code, Art. 27, § 645A. The trial court denied relief, holding that "[a] person referred to Patuxent under Section 6, Article 31B for the purpose of determining whether or not he is a defective delinquent may be detained in Patuxent until the procedures for such determination have been completed regardless of whether or not the criminal sentence

---

[3] Brief for Petitioner 6 n. 5; see Art. 31B, § 6 (b): request for examination is made to court "on any knowledge or suspicion of the presence of defective delinquency in such person." It appears that in this case the trial court issued the order *sua sponte;* prior to sentencing, the court had ordered a psychiatric evaluation by its own medical officer, who in turn recommended referral to Patuxent for further evaluation and treatment.

has expired." App. 35–36. The Court of Appeals of Maryland denied leave to appeal. App. 37–38. We granted certiorari, 404 U. S. 999 (1971).

## II

The State of Maryland asserts the power to confine petitioner indefinitely, without ever obtaining a judicial determination that such confinement is warranted. Respondent advances several distinct arguments in support of that claim.

A. First, respondent contends that petitioner has been committed merely for observation, and that a commitment for observation need not be surrounded by the procedural safeguards (such as an adversary hearing) that are appropriate for a final determination of defective delinquency. Were the commitment for observation limited in duration to a brief period, the argument might have some force. But petitioner has been committed "for observation" for six years, and on respondent's theory of his confinement there is no reason to believe it likely that he will ever be released. A confinement that is in fact indeterminate cannot rest on procedures designed to authorize a brief period of observation.

We recently rejected a similar argument in *Jackson* v. *Indiana*, 406 U. S. 715 (1972), when the State sought to confine indefinitely a defendant who was mentally incompetent to stand trial on his criminal charges. The State sought to characterize the commitment as temporary, and on that basis to justify reduced substantive and procedural safeguards. We held that because the commitment was permanent in its practical effect, it required safeguards commensurate with a long-term commitment. *Id.*, at 723–730. The other half of the *Jackson* argument is equally relevant here. If the commitment is properly regarded as a short-term confinement with a limited purpose, as the respondent suggests, then lesser safeguards

may be appropriate, but by the same token, the duration of the confinement must be strictly limited. "[D]ue process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Id.*, at 738. Just as that principle limits the permissible length of a commitment on account of incompetence to stand trial, so it also limits the permissible length of a commitment "for observation." We need not set a precise time limit here; it is noteworthy, however, that the Maryland statute itself limits the observation period to a maximum of six months. While the state courts have apparently construed the statute to permit extensions of time, see n. 2, *supra,* nevertheless the initial legislative judgment provides a useful benchmark. In this case it is sufficient to note that the petitioner has been confined for six years, and there is no basis for anticipating that he will ever be easier to examine than he is today. In these circumstances, it is a denial of due process to continue to hold him on the basis of an *ex parte* order committing him for observation.

B. A second argument advanced by the respondent relies on the claim that petitioner himself prevented the State from holding a hearing on his condition. Respondent contends that, by refusing to talk to the psychiatrists, petitioner has prevented them from evaluating him, and has made it impossible for the State to go forward with evidence at a hearing. Thus, it is argued, his continued confinement is analogous to civil contempt; he can terminate the confinement and bring about a hearing at any time by talking to the examining psychiatrists, and the State has the power to induce his cooperation by confining him.

Petitioner claims that he has a right under the Fifth Amendment to withhold cooperation, a claim we need not consider here. But putting that claim to one side, there

is nevertheless a fatal flaw in the respondent's argument. For if confinement is to rest on a theory of civil contempt, then due process requires a hearing to determine whether petitioner has in fact behaved in a manner that amounts to contempt. At such a hearing it could be ascertained whether petitioner's conduct is willful, or whether it is a manifestation of mental illness, for which he cannot fairly be held responsible. *Robinson* v. *California,* 370 U. S. 660 (1962). Civil contempt is coercive in nature, and consequently there is no justification for confining on a civil contempt theory a person who lacks the present ability to comply. *Maggio* v. *Zeitz,* 333 U. S. 56 (1948). Moreover, a hearing would provide the appropriate forum for resolution of petitioner's Fifth Amendment claim. Finally, if the petitioner's confinement were explicitly premised on a finding of contempt, then it would be appropriate to consider what limitations the Due Process Clause places on the contempt power. The precise contours of that power need not be traced here. It is enough to note that petitioner has been confined; potentially for life, although he has never been determined to be in contempt by a procedure that comports with due process. The contempt analogy cannot justify the State's failure to provide a hearing of any kind.

C. Finally, respondent suggests that petitioner is probably a defective delinquent, because most noncooperators are. Hence, it is argued, his confinement rests not only on the purposes of observation, and of penalizing contempt, but also on the underlying purposes of the Defective Delinquency Law. But that argument proves too much. For if the Patuxent staff members were prepared to conclude, on the basis of petitioner's silence and their observations of him over the years, that petitioner is a defective delinquent, then it is not true that he has prevented them from evaluating him. On that theory,

they have long been ready to make their report to the court, and the hearing on defective delinquency could have gone forward.

### III

Petitioner is presently confined in Patuxent without any lawful authority to support that confinement. His sentence having expired, he is no longer within the class of persons eligible for commitment to the Institution as a defective delinquent. Accordingly, he is entitled to be released. The judgment below is reversed, and the mandate shall issue forthwith.

*Reversed.*

MR. JUSTICE DOUGLAS, concurring.

This is an action in the Maryland courts for post-conviction relief which was denied, with no court making a report of its decision. The case is here on a petition for writ of certiorari, which we granted. 404 U. S. 999. I concur in reversing the judgment below.

McNeil was tried and convicted in a Maryland court for assault on a public officer and for assault with intent to rape. He took the stand and denied he had committed the offenses. He had had no prior criminal record. The sentencing judge asked for a psychiatric evaluation of the accused, though neither side at the trial had raised or suggested any psychiatric issues. A medical officer examined him and recommended that he be considered for evaluation and treatment at Patuxent Institution, a state psychiatric agency.

The court sentenced McNeil to "not more than five years" to prison in Hagerstown [1] and, without modifying

---

[1] Under Maryland law that sentence was subject to statutory reductions for good behavior, industrial or agricultural work, and satisfactory progress in education and vocational courses. Md. Ann Code, Art. 27, § 700 (1971).

McNeil would have been eligible for parole after one-fourth of the term or a little over one year.

or suspending that sentence, ordered him referred to Patuxent. Under Maryland law a defendant convicted of any felony or certain misdemeanors may be referred to Patuxent for determination whether he is a "defective delinquent." Md. Ann. Code, Art. 31B (1971). A "defective delinquent" is defined in Art. 31B, § 5, as "an individual who, by the demonstration of persistent aggravated antisocial or criminal behavior, evidences a propensity toward criminal activity, and who is found to have either such intellectual deficiency or emotional unbalance, or both, as to clearly demonstrate an actual danger to society so as to require such confinement and treatment, when appropriate, as may make it reasonably safe for society to terminate the confinement and treatment."

Under Art. 31B, the staff—which includes a psychiatrist, a psychologist, and a physician—shall examine the person and "state their findings" as to defective delinquency in a written report to the court. Art. 31B, § 7 (a). And it is provided that once transferred to Patuxent, the person in question shall remain there "until such time as the procedures . . . for the determination of whether or not said person is a defective delinquent have been completed, without regard to whether or not the criminal sentence to which he was last sentenced has expired." [2] Art. 31B, § 6 (e) (Supp. 1971).

The examination normally entails psychiatric interviews and evaluation, psychological tests, sociological and

---

[2] At the time of McNeil's referral, the Act required that the report be filed no later than six months from the date he was transferred to Patuxent or before expiration of his sentence, whichever last occurred. Md. Ann. Code, Art. 31B, § 7 (a) (1957 ed., Supp. 1966) An amendment effective July 1, 1971, required that the report be filed no later than six months from the date he was transferred to Patuxent or three months before expiration of his sentence, whichever occurs first. Art. 31B, § 7 (a) (Supp. 1971).

social work studies, and review of past history and records, including police, juvenile, penal, and hospital records. Personal interviews include a series of questions to elicit and to determine the past criminal record, and anti-social and criminal behavior of the individual.

If the report shows that he should not be classified as a defective delinquent, he is retained in custody under his original sentence with full credit given for the time confined at Patuxent. Art. 31B, § 7 (a) (Supp. 1971). If the report says that he should be classified as a defective delinquent, a hearing is held, at which the defendant is entitled to counsel and a trial by jury. Art. 31B, § 8.

McNeil, though confined at Patuxent beyond the term of five years for which he was sentenced, has never had such a hearing, for he has never been declared a "defective delinquent." [3] He has not been so declared and on the other hand has not been cleared, because he has refused on at least 15 separate occasions to submit to the psychiatric tests and questions. Nor has he received in the interim any rehabilitative treatment or training. The State, indeed, intends to keep him there indefinitely, as long as he refuses to submit to psychiatric or psychological examinations. [4]

McNeil's refusal to submit to that questioning is not quixotic; it is based on his Fifth Amendment right to be

---

[3] Detention beyond the expiration of court-imposed sentences occurs in Communist China where "public security organs [have] the authority to impose as well as administer punishment" and "the discretionary power to extend the duration of imprisonment beyond the original sentences." Shao-chuan Leng, Justice in Communist China 34 (1967).

[4] In the District Court proceedings in *Murel* v. *Baltimore City Criminal Court, post,* p. 355, Dr. Boslow, the Director of Patuxent, testified:

"[The Court] . . . Take the case of a person who is referred for diagnosis and he fails, let us say, 100 per cent, to cooperate;

silent. McNeil remains confined without any hearing whatsoever as to whether he has a propensity toward criminal activity and without any hope of having a hearing unless he surrenders his right against self-incrimination.[5]

The Fifth Amendment prohibition against compulsory self-incrimination is applicable to the States by reason of the Fourteenth. *Malloy* v. *Hogan,* 378 U. S. 1. The protection extends to refusal to answer questions

---

he won't talk to anybody, he won't undergo any tests, he won't participate, though I don't think he gets group therapy.

"[Dr. Boslow] No, sir.

"[The Court] But he will do absolutely nothing and will take no advantage of whatever opportunity if any there may be.

"He, therefore, assuming that the law is valid, and assuming that the administration in that respect is supportable, could he remain there indefinitely unclassified? Is that correct?

"[Dr. Boslow] Under the present state of things, yes."

[5] As stated in a provocative and searching study in Virginia:

"Certainly, a prisoner is not entitled to all the constitutional rights enjoyed by free citizens, but the burden of showing what restrictions are necessary for the preservation of prison order should fall upon prison officials. Widespread, sweeping denials of freedom should not be tolerated. Ideally, the legislative and executive branches of government should decide the extent to which liberty must be denied. No organ of government is better suited than the legislature to consider the penological developments of the last few decades in order to determine the extent to which restrictive practices are warranted. But after legislative command or in its absence, the courts must decide whether the balance of competing interests effected by legislative compromise or executive fiat comports with specific constitutional guarantees and traditional notions of due process. In this context the 'hands-off doctrine' has no place. The judiciary functions as more than a final arbiter; it has a responsibility for educating the public and, where it fails to act, it functions to legitimize the status quo. The simple failure of the courts to review prison conditions blunts the success of important constitutional inquiries, impedes the flow of information and encourages abuse." Hirschkop & Millemann, The Unconstitutionality of Prison Life, 55 Va. L. Rev. 795, 835–837 (1969).

where the person "has reasonable cause to apprehend danger from a direct answer." *Hoffman* v. *United States,* 341 U. S. 479, 486; see *Spevack* v. *Klein,* 385 U. S. 511. The questioning of McNeil is in a setting and has a goal pregnant with both potential and immediate danger. To be labeled a "defective delinquent," McNeil must have demonstrated a "persistent aggravated anti-social or criminal behavior" and "a propensity toward criminal activity." Art. 31B, § 5.

McNeil was repeatedly interrogated not only about the crime for which he was convicted but for many other alleged antisocial incidents going back to his sophomore year in high school. One staff member after interviewing McNeil reported: "He adamantly and vehemently denies, despite the police reports, that he was involved in the offense"; "Further questioning revealed that he had stolen some shoes but he insisted that he did not know that they were stolen . . ."; "but in the tenth grade he was caught taking some milk and cookies from the cafeteria"; "He consistently denies his guilt in all these offenses"; "He insisted that he was not present at the purse snatching"; "He was adamant in insisting on this version of the offense despite the police report which was in the brief and which I had available and discussed with him"; "He continued his denial into a consideration of a juvenile offense . . ."; "He denies the use of all drugs and narcotics"; ". . . I explained to him that it might be of some help to him if we could understand why he did such a thing but this was to no avail." Brief for Petitioner 36 n. 43.

Some of the questioning of McNeil was at a time when his conviction was on direct appeal or when he was seeking post-conviction relief. Concessions or confessions obtained might be useful to the State on a re-trial or might vitiate post-conviction relief. Moreover, the privilege extends to every "link in a chain of evidence

sufficient to connect" the person with a crime. *Malloy* v. *Hogan*, 378 U. S., at 13. Whether or not a grant of immunity would give the needed protection in this context is irrelevant, because we are advised that there is no such immunity under state laws.

Finally, the refusal to answer results in severe sanctions, contrary to the constitutional guarantee.

First, the staff refuses to diagnose him, no matter how much information they may have, unless he talks. The result is that he never receives a hearing and remains at Patuxent indefinitely.

Second, if there is no report on him, he remains on the receiving tier indefinitely and receives no treatment.

Third, if he talks and a report is made and he is committed as a "defective delinquent," he is no longer confined for any portion of the original sentence. Art. 31B, § 9 (b). If he does not talk, McNeil's sentence continues to run until it expires and yet he is kept at Patuxent indefinitely. We are indeed advised by the record in the *Murel* case that 20% of Patuxent inmates at that time were serving beyond their expired sentences and of those paroled between 1955 and 1965, 46% had served beyond their expired sentences.

Whatever the Patuxent procedures may be called—whether civil or criminal—the result under the Self-Incrimination Clause of the Fifth Amendment is the same. As we said in *In re Gault*, 387 U. S. 1, 49–50, there is the threat of self-incrimination whenever there is "a deprivation of liberty;" and there is such a deprivation whatever the name of the institution, if a person is held against his will.

It is elementary that there is a denial of due process when a person is committed or, as here, held without a hearing and opportunity to be heard. *Specht* v. *Patterson*, 386 U. S. 605; *Humphrey* v. *Cady*, 405 U. S. 504.

McNeil must be discharged forthwith.