RONNIE SMITH *v.* DIRECTOR, PATUXENT
INSTITUTION

[No. 983, September Term, 1974.]

*Decided July 25, 1975.*

The cause was argued before ORTH, C. J., and MELVIN, J., and EDWARD F. BORGERDING, Administrative Judge of the District Court of Maryland for District 1, specially assigned.

*Murray L. Deutchman, Assigned Public Defender,* for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Robert S. Rothenhoefer, State's Attorney for Frederick County,* and *Cleopatra Campbell, Assistant State's Attorney for Frederick County,* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

On 22 March 1971 at a bench trial in the Circuit Court for Frederick County Ronnie Smith was convicted of robbery and sentenced to 6 years.[1] The judgment was affirmed on appeal. *Smith, et al. v. State,* No. 242, September Term, 1971, filed 22 November 1971, unreported, *cert. denied,* 264 Md. 751.

---

* Note: *Certiorari* denied, Court of Appeals of Maryland, October 6, 1975.

1. Ronnie Smith was also known as Robert Dawson and Robert Dorsey. He was jointly indicted and jointly tried with Merhl N. Smith, Jr. who was also convicted of robbery and sentenced to 8 years.

On 23 March 1971 the trial court ordered the Commissioner of Correction to deliver Ronnie into the custody of the Director of Patuxent Institution for examination and evaluation as a possible defective delinquent. Code, Art. 31B, § 6 (b). Ronnie arrived at Patuxent on 25 May 1971. He refused to submit to examination or to participate in testing procedures. Because of his failure to cooperate, the Patuxent staff indicated about 30 June 1972 that they were unable to evaluate him. In July 1972 Ronnie was one of a number of Patuxent patients who petitioned the Circuit Court for Montgomery County for the issuance of a writ of *habeas corpus*, seeking release from the Institution because no evaluation of them had been made within six months of their arrival pursuant to Code, Art. 31B, § 7 (a). On 14 August Patuxent filed a report in the Circuit Court for Frederick County giving the opinion that Ronnie met the definition of a defective delinquent. On 24 August the Circuit Court for Frederick County summoned Ronnie before it and advised him of the substance of the report. It informed him that there would be a hearing to determine whether he was a defective delinquent and that counsel would be appointed to represent him. Art. 31B, § 8 (a).

On 4 October 1972, the Circuit Court for Montgomery County, Shearin, J., acting in the *habeas corpus* proceeding, concluded that the reporting provisions of Art. 31B, § 7 (a) [2] were mandatory and hence Ronnie was entitled to be released from Patuxent and transferred to the Division of Correction for the service of his original sentence.[3] It issued an order to that effect. The Director took a timely appeal

---

**2.** "[The persons designated by the statute to make the examination on behalf of the Institution] shall state their findings in a written report addressed to the court, not later than six months from the date said person was received in the Institution for examination, or three months, before expiration of his sentence, whichever first occurs."

**3.** Judge Shearin also indicated that McNeil v. Director, 407 U. S. 245, had held unconstitutional that portion of Art. 31B, § 6 (e) which provided for the retention of a person in the custody of Patuxent "until such time as the procedures of the subtitle for the determination of whether or not said person is a defective delinquent have been completed, without regard to whether or not the criminal sentence to which he was last sentenced has expired."

from the order to the Court of Special Appeals. The Court of Appeals granted certiorari before decision by us. It reversed the order. *Director v. Cash*, 269 Md. 331, decided 14 June 1973. Ronnie was returned to Patuxent. On 8 October 1973 Patuxent resubmitted the evaluation of him made under date of 14 August 1972. On 23 October 1973 Ronnie was again summoned before the Circuit Court for Frederick County and advised pursuant to Art. 31B, § 8 (a). Hearing for determination of defective delinquency was scheduled for 20 November. On 31 October Ronnie filed a motion to dismiss and on 5 November moved for permission to employ a private psychiatrist to examine him pursuant to Art. 31B, § 7 (b), and for a postponement of the hearing pending the examination. The motions were heard on 8 November. On 4 February 1974 the court denied the motion to dismiss, and granted the motion to employ a private psychiatrist and postpone the hearing. In September 1974 Ronnie was informed that the hearing was set for 18 October. He again moved to dismiss the action. The motion was denied on 18 October and the hearing proceeded before a jury. The jury determined that he was a defective delinquent and by order issued the same date Ronnie was committed to Patuxent for an indeterminate period. Application for leave to appeal was timely filed on 18 November. Art. 31B, § 11; Maryland Rule 1094 a 1.[4] We granted the application on 21 January 1975 and ordered the case transferred to our regular appeal docket. Art. 31B, § 11; Rule 1094 c. Briefs were filed. Oral argument was made on 23 June 1975.

## QUESTIONS PRESENTED

Ronnie presents three questions for determination:

I. "Whether the delay between [his] commitment to Patuxent and his trial was so great that it denied [him] due process of law."

II. "Whether the lower Court erred in refusing to instruct the jury that the experts' finding of

---

4. The 30th day after 18 October 1974 was 17 November, a Sunday. See Rule 8.

defective delinquency requires a 'diagnosis and prognosis using acceptable and recognized medical and psychiatric procedure'."

III. "Whether the Court erred in failing to grant [his] timely motion for a mistrial during the testimony of Dr. Harold Boslow."

## I

The first question concerns the propriety of the denial of the motions made to dismiss the defective delinquency action with prejudice. Ronnie alleges that the delay between the time he arrived at Patuxent and the time he was evaluated to be a defective delinquent, and between the time he was so evaluated and the time of the defective delinquency hearing, denied him due process of law.

### The Lapse of Time between the Arrival at Patuxent and the Evaluation

We note first that the six months designation for the filing of the written report of the examination of a possible defective delinquent is directory and not mandatory. *Director v. Cash, supra,* at 341-345. Therefore, Ronnie was not entitled to have the report of the examination of him filed within six months of his arrival at Patuxent as a matter of statutory right.

Ronnie's argument goes this way. *State v. Musgrove,* 241 Md. 521, held, at 532, that despite the provisions as to time for reporting in § 7 (a), "the order of a court referring a person to Patuxent for an examination until such time as the procedures for determining whether or not such person is a defective delinquent have been completed could not be defeated by the refusal of such person to submit to the examination required by § 7 (a) if the Patuxent staff cannot make its determination without it." The Court found it "clear. that a person cannot complain of the action, or inaction, of others when he is the cause of the delay that ensues." Pointing to the phrase "if the Patuxent staff cannot make its determination without it" as a proviso to the rule

that a person may not defeat the purpose of the statute by refusing to submit to examination, Ronnie cites the express approval of the Court in *Roberts v. Director,* 226 Md. 643, 650, to the assertion that a person is entitled to have the issue of defective delinquency tried within a reasonable time after the Institution has had reasonable time to make its findings. He refers to the statement in *McNeil v. Director,* 407 U. S. 245, 251-252, after holding, at 250, that it is a denial of due process to hold a person on the basis of an *ex parte* order committing him for observation, that "if the Patuxent staff was prepared to conclude, on the basis of petitioner's silence and their observations of him over the years, that petitioner is a defective delinquent, *then it is not true that he has prevented them from evaluating him.* On that theory, they have long been ready to make their report to the Court, and the hearing on defective delinquency could have gone forward." (emphasis added by Ronnie). Due process, the Court continued, requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed. It is Ronnie's view that Patuxent has answered the question whether the lapse of time between his arrival at the Institution and the evaluation report was reasonable by filing a report despite the refusal of him to cooperate. He asserts: "Patuxent has taken itself out from under the protective umbrella of *Musgrove,* for Patuxent has admitted that, as to [him], the Patuxent staff could make its determination without a personal examination. Therefore the 'non-cooperation' was irrelevant to their ability to make such an evaluation." Thus, the failure to evaluate him for some 15 months, he concludes, was unreasonable and a denial of due process.

We find the answer to this argument in *Cash.* As we have noted, Ronnie was the petitioner in one of the cases before the Court in *Cash.* The Court found *McNeil* clearly distinguishable from the cases before it and saw indication in *McNeil* that the decision was to be narrowly applied. 269 Md. at 345. "We do not consider any of the petitions filed in *Cash* to be within the holding of the Supreme Court in *McNeil* and, further, we do not perceive any holding in

*McNeil* that our opinion in *Musgrove* is impaired. Indeed, in *McNeil*, the Supreme Court in Note 2 of its opinion cites *Musgrove* and *Mullen v. Director*, 6 Md. App. 120, 250 A. 2d 281 (1969), applying *Musgrove* for the proposition that the Maryland Courts have construed § 7 (a) 'to permit extension of the allowable time . . . in the case of a noncooperative defendant who resists examination.' There is no suggestion that this was unconstitutional or otherwise improper." *Id.* at 349. The Court specifically approved the procedure followed with regard to Ronnie, *id.* at 347:

"After the decision by the Supreme Court in *McNeil* on June 19, 1972, the staff was faced with the problem that an undiagnosed person would be released when his sentence expired. After consultation with the Patuxent Board and with counsel, the staff attempted, where possible, to diagnose individuals referred for examination who had declined to cooperate in the examination process on the bases of historical data in the file of each individual. Dr. Boslow further testified, in effect, that he and the staff prefer not to make a diagnosis without a personal interview, but that such a diagnosis would be 'valid' in the absence of a showing of an intentional and deliberate designation on the part of the officials of Patuxent to postpone the diagnosis for an unreasonable time (and there is no such evidence in the present cases). The procedure presently followed by the Patuxent officials is proper in accordance with our opinion in *Musgrove*." [5]

---

5. The Court noted, 269 Md. at 347-348:

"During the period of time from the filing of the petitions in the *Cash* case in the lower court and the time of hearing, Patuxent attempted to make a diagnosis pursuant to § 7 (a) on all of the petitioners and filed reports with the referring courts, diagnosing 34 petitioners as defective delinquents, stating in 10 reports that diagnoses could not be made because of the patients' refusal to cooperate in the evaluation process and the lack of any historical data in their respective files. Of the 50 petitions filed in the lower court, six petitioners were discharged for miscellaneous reasons by the lower court."

In the light of the Court of Appeals opinions that the procedure followed with respect to Ronnie was proper, we hold that he was not denied due process of law thereby.

### The Lapse of Time between the Report of Examination and the Date of the Hearing

The report of examination opining that Ronnie was a defective delinquent was first filed on 14 August 1972; the hearing to determine defective delinquency was on 18 October 1974. Art 31B, § 8 deals with defective delinquency hearings. If the report of the Institution states that a person is a defective delinquent, the court shall forthwith summon the person before it. It shall advise him of the substance of the report, of the pendency of a hearing, and of his right to be represented by counsel of his choice or by competent counsel appointed by the court. Subsection (a). "Unless appearance of counsel chosen by the person is entered within twenty days following the proceeding set forth in subsection (a) hereof, the court shall appoint counsel to represent the person." Subsection (b). "The hearing for determination of defective delinquency shall be held no less than thirty days following designation of counsel, unless acceleration of the time is requested by the person or his counsel." Subsection (c).[6]

In *Marsh v. State*, 22 Md. App. 173, 181, we found it clear that § 8 mandates arraignment, appointment of counsel, and hearing upon receipt by the court of a report from Patuxent that an inmate is a defective delinquent. We held, at 182, that "§ 8 becomes effective whenever Patuxent's written report commanded by § 7 (a) declares that a patient is a defective delinquent." We observed: "Upon the filing of such a report the patient named therein forthwith is entitled to the rights granted by subsections (b) and (c) of § 8. Under such circumstances, those rights may not be deferred because of an alleged failure of the inmate to submit to personal examinations." *Id.*

Here there was compliance with the provisions of § 8 (b).

---

6. Subsection (c) further provides that trial by jury may be had upon application of the State or of the person or upon the court's own motion.

Ten days after the report of Patuxent was filed in the Circuit Court for Frederick County Ronnie was brought before the court and advised pursuant to the statute. On 8 October 1973, when Patuxent resubmitted the report, he was again summoned before the court and so advised.

Section 8 (c) does not specify a maximum time within which a hearing must be held. It prohibits a hearing within 30 days of the designation of counsel unless the person believed to be a defective delinquent or his counsel requests an earlier hearing. No such request was made here. In fact, when Ronnie appeared before the Circuit Court for Frederick County on 24 August 1972 to be advised pursuant to § 8 (b), he said he had counsel, and asked how Patuxent could find him to be a defective delinquent without interviewing him. He inquired about the *habeas corpus* proceeding pending in the Circuit Court for Montgomery County. When told by the court that the hearing to determine the question of his defective delinquency would be a maximum of 50 days hence,[7] he asked if he could get it postponed. Several times thereafter during the course of the hearing he said he wanted a postponement of the defective delinquency hearing.

We see nothing unreasonable in continuing the defective delinquency proceedings until the final disposition, at least in the Maryland courts, of the *habeas corpus* action instituted by Ronnie in *Cash*.[8] Obviously, had the order of the Circuit Court for Montgomery County been upheld, the question of defective delinquency *vel non* would have been moot. We note that under the order issued in that proceeding Ronnie was removed from Patuxent, apparently

---

7. The court explained:

"In other words, it can be held sooner than that, depending upon what course of action you should take. If you desire to have your own counsel and he enters his appearance promptly, then the hearing will be held within thirty days from the time he enters his appearance. If he requests an early hearing we will try to work it in earlier. If you do not have counsel of your own choice then the Court after twenty days will appoint counsel and the hearing will be held within thirty days from that date."

8. Certiorari was denied by the Supreme Court of the United States, *sub nom.* Vucci, et al. v. Boslow, Inst'n Director, 414 U. S. 1136, Jan. 7, 1974.

in October 1972, to the custody of the Division of Correction and not returned to Patuxent until the end of June 1973.

The court below found that three months were allowed after Ronnie's return to Patuxent to ascertain if he would then cooperate in the examination procedures. When it was certain that he would not, the Institution, on 8 October 1973, resubmitted its evaluation report of 4 August 1972 to the Circuit Court for Frederick County.[9] Ronnie was then forthwith, on 23 October, summoned before the court and advised pursuant to Art. 31B, § 8 (a). On 5 November 1973, through his counsel, he filed a written motion for a continuance of the hearing. He stated that he was "entitled to examination by a psychiatrist of his own choosing, however because of the short notice of trial the psychiatrist which the Defendant has chosen to examine him is unable to make the examination, review the records and present the testimony to the Court on such short notice. The Defendant reserves his right to proceed on the Motion to Dismiss and still requests a hearing on that Motion be set." The hearing on the Motion to Dismiss was held on 4 February 1974 and denied. Patently, it was proper not to act on the motion to appoint a private psychiatrist until the determination of the motion to dismiss the defective delinquency action. An order granting permission to have a private psychiatrist examine Ronnie was issued the same day the motion to dismiss was

---

**9.** In the record before us is a copy of a letter dated 10 August 1972 from the Deputy Attorney General to the State's Attorney for Frederick County which contains the following:

"In conjunction with the staff and Board of Governors of Patuxent Institution and this office, individuals who refuse to cooperate, but whose files contain sufficient information to make a diagnosis without a personal interview, will be diagnosed and reports forwarded to the courts. Although this places a heavier burden on the alleged defective delinquent, as his cooperation might have given the diagnosing agent more valid information, it was decided that this procedure would be followed in order to keep within the spirit of McNeil, supra.

I have been asked to advise you that Patuxent Institution has diagnosed Merhl Smith and Ronnie Smith as defective delinquents and the reports of the Institution should be forwarded to your court shortly. This will obviate the necessity of instituting contempt proceedings and defective delinquency hearings pursuant to Article 31B, Section 8, may be arranged following receipt of the reports from Patuxent Institution."

denied. Brian Crowley, M.D. was appointed by the court as the private psychiatrist to examine Ronnie "for the purposes of determining whether he is a defective delinquent. . . ." It was brought out at the trial on 18 October 1974 that Dr. Crowley examined Ronnie on 26 February 1974 and submitted a report dated 1 October 1974.[10]

Under the particular facts and circumstances surrounding the delay in holding the hearing to determine Ronnie's defective delinquency, we see no denial of due process of law. We hold that the court did not err in denying the motion to dismiss the proceeding.

## II

Ronnie filed with the court proposed instructions, Maryland Rule 554 a, which included this one as #3:

> "The finding of defective delinquency must be based on medical and psychiatric evaluation and depends on a diagnosis and prognosis, using acceptable and recognized medical and psychiatric procedure. In evaluating the testimony of witnesses you may consider the procedure used and the means chosen by each of the experts to reach the opinion given."

He claims that the court refused to give the instruction as proposed and that the refusal to do so was prejudicial error.

Rule 554 b 1 permits the court to instruct the jury upon the law by granting requested instructions or by giving instructions of its own, or by several or all of those methods. It need not grant any requested instruction, even if proper, if the matter is fairly covered by instructions actually given. A party aggrieved by any portion of an instruction given, or by the failure to give any instruction, must, before the jury

---

10. Dr. Crowley's report was admitted as State's Exhibit 3. Based upon a personal interview of Ronnie as well as the records with regard to him, Dr. Crowley concluded "that Ronnie Smith meets the definition of defective delinquency to be found in Section 5, Article 31B." Dr. Crowley added: "In so stating, I do not imply any approval of that definition, or any approval of the program of confinement and alleged treatment at Patuxent Institution."

retires to consider its verdict, make objection "stating distinctly the portion or omission, or failure to instruct to which he objects and the ground of his objection." Rule 554 d. Upon appeal a party assigning error in the instructions shall be restricted to "(1) particular portion of the instructions given or the particular omission therefrom or the particular failure to instruct distinctly objected to before the jury retired and (2) the grounds of objection distinctly stated at the time, and no errors or assignments of error in the instructions shall be considered by the appellate court." Rule 554 e.

After the court charged the jury here, counsel were given the opportunity to make objection in open court out of the presence of the jury as provided by Rule 554 d. Ronnie's counsel requested that his proposed instruction 5 be given.[11] The judge explained that he had covered it in the instructions given. Defense counsel said: "All right, Your Honor, I stand corrected and I'm sorry for the exception." He withdrew the objection and declared that he had no other objections. Therefore, the assignment of error raised on appeal may not be considered by us.

## III

Ronnie claims that the court below erred in denying his motion for a mistrial. The motion was made out of the presence of the jury during the cross-examination of Dr. Harold Boslow, Director of Patuxent Institution, called as a witness by the State. Dr. Boslow stated that it was his opinion that Ronnie was a defective delinquent, but that it was not based on "personal knowledge as to the young man" because Ronnie "wouldn't talk to anybody." The witness was requested to give his "professional opinion as to the propriety and feasibility of an opinion, within the defective

---

11. Proposed instruction 5 read: "You are instructed that a person is not a defective delinquent merely because he has evidenced criminal behavior. There are many persons who participate in criminal activity who are not defective delinquents. The courts have judicially noticed that fully 80% of convicted criminals are not defective delinquents. You are therefore instructed that a mere finding that the defendant is a habitual criminal is not sufficient to find that he is a defective delinquent."

delinquency context, of rendering such an opinion without a personal interview as a psychiatrist." He replied:

> "I don't think it's desirable, but it's the only thing we can do. I think that in view of the patient's persistent refusal to see either psychiatrist, psychologist or social worker, and the Court's pressing us to produce a document, we produced a document. I don't think it's desirable, but I think that it's a good opinion and it's the best that we can offer under the circumstances."

He was reminded by defense counsel that he was asked that exact question before in another case and that he had answered:

> "I think it is non-valid, superficial and unethical and impossible."

Dr. Boslow attempted to explain. The transcript reads:

> "A  Impossible from the viewpoint of giving a definitive diagnosis; but if we have to give a report to the Court and the Court presses us, then I would do this. This was —
>
> Q  Would you give an unethical report—
>
> A  Wait a minute, you're asking the question. You're asking for two levels of responsibility. It's all right for your client to refuse to take—
>
> MR. DEUTSCHMAN [Defense Counsel]: Your Honor, this is going beyond the scope of the question.
>
> THE COURT: I think he has a right to explain his answer, and I will overrule the objection. You may answer.
>
> WITNESS: You say your client has a right to refuse to be examined, and —
>
> MR. DEUTSCHMAN: I haven't said anything, Doctor.

WITNESS: This is — this is what you're implying — don't play games with me.

MR. DEUTSCHMAN: Your Honor, I object to the witness going beyond the scope of the question.

THE COURT: He's trying to explain his answer and that's perfectly permissible, and I'm not going to rule on it any more times. You may answer, Doctor.

WITNESS: Your client refuses to take the examination. You say that's all right. We don't have anything to offer the Court except our review of his history. Now, my experience with twenty years in this particular situation, and more before that, indicates to me that this man's behavior in the community and his entire life history indicate that he is dangerous. I have nothing else to go on. If you want your client to have a fair shake, advise your client to take the examinations."

At this point defense counsel asked for permission to approach the bench and moved for a mistrial.

"THE COURT: On what basis?

MR. DEUTSCHMAN: On the basis of the fact that I asked the witness a question and the Court permitted the witness to continue on a matter which is totally irrelevant to the question asked, making insinuations of — that are not matters of fact and have nothing to do with the question before the Court.

THE COURT: I agree, the answer was not responsive. I overruled your objection because I thought the Doctor was going to explain his answer, which I think he had a perfect right to do. However, when he says if you want to have your client have a fair shake, or whatever, that aspect of it, I think that's improper and I will instruct the jury to

disregard that aspect, but I will overrule your motion for a mistrial."

The court told the jury:

Ladies and gentlemen of the jury, I think that the last statement of the Doctor concerning Mr. Smith was improper and was not responsive to the ... question; and the jury will disregard that aspect and strike that from your minds."

The hearing continued.

In *Quecedo v. DeVries*, 22 Md. App. 58, 68, we repeated what we said in *Baldwin v. State*, 5 Md. App. 22, 28:

"The granting of a mistrial is an exercise which rests within the discretion of the trial judge. A mistrial should be granted only where plain and obvious reasons exist, upon the greatest caution and under urgent circumstances. Where, in the exercise of this discretion, the trial court refuses to grant a mistrial, such a decision will not be disturbed on appeal without giving full regard to the fact 'that the trial court is in an advantageous position to judge the question of prejudice, and its decision with reference thereto should not be reversed unless it is clear that there was prejudice.' *Carroll v. State*, 3 Md. App 50, 53, 237 A. 2d 535, 538 (1968) quoting *Cook v. State*, 225 Md. 603, 610, 171 A. 2d 460, 463, *cert. den.* 368 U. S. 970, 82 S. Ct. 445, 7 L.Ed.2d 398 (1961)."

In view of the curative instruction here, we see no abuse of discretion by the court below in refusing to grant a mistrial. *See Wilhelm v. State*, 272 Md. 404, 423-424.

> *Order of 18 October 1974 committing appellant to the jurisdiction of the Patuxent Institution for an indeterminate period affirmed.*