644 F.2d 313
 Fed. Sec. L. Rep. P 97,892
SECURITIES AND EXCHANGE COMMISSION, Appellee,
v.
Sheldon MOSS, Individually and d/b/a Television Marketing;
Correlated Equities Corporation, Appellants,
and
National Executive Planners, Inc., Dan King Brainard, Roy
Heybrock, William H. Cain, Richard O. White, Barry
Eugene Weed, Defendants.
 No. 79-1813.
 United States Court of Appeals,
Fourth Circuit.
 Submitted Nov. 4, 1980.
Decided March 10, 1981.
 
 Joel A. Haber, Chicago, Ill. (Floyd Babbitt and Eric Lieberman, Chatz, Sugarman, Abrams, Haber & Fagel, Chicago, Ill., on brief), for defendants-appellants.
 Michael K. Wolensky, Associate Gen. Counsel, Washington, D. C. (John P. Sweeney, Asst. Gen. Counsel, Chicago, Ill., Harlan W. Penn, Washington, D. C., attorney, on brief), for appellee.
 Before INGRAHAM*, Senior Circuit Judge, and HALL and ERVIN, Circuit Judges.
 K. K. HALL, Circuit Judge:
 
 
 1
 Sheldon S. Moss appeals from an order of the district court holding him in civil contempt and committing him to the custody of the U. S. Marshal for failing to comply with an order entered on a consent judgment of permanent injunction and other relief entered by the same court on January 22, 1979. We affirm the district court's contempt and commitment order.
 
 
 2
 The consent judgment in issue arose from a complaint brought by the Securities and Exchange Commission (SEC) in civil enforcement proceedings against Moss and others. The SEC alleged, inter alia, that Moss, individually and doing business as Correlated Equities Corporation, and others had violated the antifraud and registration provisions of the federal securities laws.[1] Moss, through counsel, consented to the entry of a preliminary injunction. On January 22, 1979, again through counsel, Moss consented to the entry of a permanent injunction. An order was entered by the district court upon the parties' consent and signature. The consent order required Moss to deposit.$4.5 million in the court registry and prohibited him from disposing of his assets without prior court approval, except in limited circumstances.[2] The consent order further provided that:
 
 
 3
 Correlated Equities and Sheldon Moss ... deposit and remit the above described monies by February 28, 1979, or file with the plaintiff, Securities and Exchange Commission a detailed schedule of the monthly receipt and disbursement of all monies, funds, and properties for each of them and all persons or corporations controlled directly or indirectly, by them by the 10th day of the month following the month covered by said schedule of receipts and disbursements until said sum is paid, the first schedule covering January and February, 1979, to be filed by March 10, 1979.
 
 
 4
 Moss filed monthly reports for January, February and March in compliance with the consent judgment. On April 30, 1979, the SEC petitioned the district court for an adjudication in civil contempt against Moss for failing to deposit the.$4.5 million in the court registry. On June 26, 1979, a contempt hearing was held during which the district court questioned the parties extensively regarding the intent of the consent judgment. At this time Moss argued the consent judgment provided him with alternate means of compliance, to wit: the deposit of.$4.5 million or the timely filing of reports on receipts and disbursements. The district court denied the SEC's petition for contempt but rejected Moss' argument. By order filed July 13, 1979, it found:
 
 
 5
 a meeting of the minds of all the parties occurred on January 22, 1979, the date the agreement was signed and filed, and it is concluded that the intent of the parties was that the defendants Correlated Equities Corporation and Sheldon Moss pay into the Clerk of the Court $4,500,000.00 in negotiable U. S. Government Securities "within a reasonable time" from the date on which the consent decree and injunction was entered.
 
 
 6
 The district court further found that the reasonable time for compliance had expired and it ordered Moss to deposit the money and file the required reports by August 1, 1979. This deadline was later amended to September 1, 1979.
 
 
 7
 On August 21, 1979, in connection with a related matter, the reports for April, May and June of 1979 were delivered. These reports disclosed that Moss had sold a condominium apartment and some shares of bank stock without the court's approval. Nine days later the SEC filed another petition to hold Moss in civil contempt for selling these assets without court approval and for claiming excessive living expenses. At the contempt hearing Moss claimed he had sold these assets to support his family and to pay counsel fees. Following this hearing, but before the court issued its order, Moss filed an affidavit stating that he was unemployed and that he had virtually no assets.
 
 
 8
 On September 20, 1979, the district court issued an order holding Moss in civil contempt and ordering his commitment until he purged himself by paying the.$4.5 million. Moss filed another affidavit stating his poverty. The district court stayed its commitment order pending this appeal. On May 8, 1979, following the entry of a guilty plea to 16 counts of mail fraud, Moss was sentenced to 8 years in prison.
 
 
 9
 On appeal Moss argues there was no basis for holding him in civil contempt because he did not violate the consent order. Moss renews his argument that the January 22, 1979, order provided for alternate means of compliance. We, too, find this argument unpersuasive. If Moss' position were to be accepted, he could forever avoid the payment of the.$4.5 million by filing timely reports. Furthermore, it is clear that Moss violated that portion of the consent judgment which prohibited the sale of assets without court approval except in limited circumstances. Moss was only permitted to use his personal funds for the payment of living expenses and counsel fees. The sale of assets without court approval was restricted to sales for the purpose of funding repayment or repaying Television Marketing's indebtedness. The sale of assets for other purposes required prior court approval which Moss did not request or receive.
 
 
 10
 Moss also contends the district court improperly modified the consent judgment and order by inferring the parties meant to require payment within a reasonable time. The district court acted well within its powers in determining the parties' intent when they entered into the consent judgment. U. S. v. ITT Continental Baking Co., 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975). The district court's determination that there was a meeting of minds and that a reasonable time for compliance was intended was a permissible exercise of its "inherent power to supervise and aid the implementation of settlement agreements in pending litigation." Wood v. Virginia Hauling Co., 528 F.2d 423 (4th Cir. 1975).
 
 
 11
 Moss' final contention is that since he does not have the present financial ability to comply with the consent order, the commitment will serve no remedial purpose. The district court heard testimony and evaluated the evidence presented to show Moss' inability to comply with the consent order. It did not credit much of Moss' testimony, especially in light of the government's allegations that Moss was attempting to evade the judgment. We find no abuse of discretion by the district court. When Moss completes his present criminal sentence, he may then present whatever new evidence is available to demonstrate his inability to comply with the consent order.
 
 
 12
 AFFIRMED.
 
 ERVIN, Circuit Judge, dissenting:
 
 13
 Although I agree with the majority that Moss violated the consent order, his inability to comply is, in my opinion, a complete defense. I, therefore, respectfully dissent from the majority's affirmance of the district court's contempt order.
 
 
 14
 The Supreme Court has long recognized, as this court fails to do today, that the purpose of civil contempt is coercive rather than punitive, and that one who simply cannot comply with an order cannot be held in contempt for failing to do so. See McNeil v. Director, Patuxent Institution, 407 U.S. 245, 251, 92 S.Ct. 2083, 2087, 32 L.Ed.2d 719 (1972) ("Civil contempt is coercive in nature, and consequently there is no justification for confining on a civil contempt theory a person who lacks the present ability to comply."); United States v. Bryan, 339 U.S. 323, 330, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950) ("Ordinarily, one charged with contempt of court for failure to comply with a court order makes a complete defense by proving that he is unable to comply."); see also D. Dobbs, Remedies 103-05 (1973).
 
 
 15
 Maggio v. Zeitz, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948), is particularly instructive in this case, for in Maggio the Supreme Court refused to allow a contempt citation to stand when compliance with a court order was impossible. Maggio, as president and manager of a bankrupt corporation, had been held in contempt for failure to comply with a turnover order, despite evidence showing that he did not have possession of the goods and hence could not comply with the order. In vacating the Second Circuit's affirmance of the district court's finding of contempt, the Court said:
 
 
 16
 The nature and derivation of the remedy make clear that it is appropriate only when the evidence satisfactorily establishes the existence of the property or its proceeds, and possession thereof by the defendant at the time of the proceeding.... Conduct which has put property beyond the limited reach of the turnover proceeding may be a crime, or, if it violates an order of the referee, a criminal contempt, but no such acts, however reprehensible, warrant issuance of an order which creates a duty impossible of performance, so that punishment can follow.
 
 
 17
 333 U.S. at 64, 68 S.Ct. at 405.
 
 
 18
 Impressed by the Second Circuit's admission of Maggio's inability to comply,[1] the Court felt it unnecessary to inquire whether that finding was justified by the evidence in the record.[2]
 
 
 19
 Moss' contempt citation remains in effect, and hence his imprisonment continues, until he purges himself by paying four and a half million dollars into the district court's registry; this is the total payment contemplated by the consent order. The record in this case reflects not only that the state of Moss' finances left him in no position to pay such a vast sum, but also that the district court was fully aware of that circumstance. Moss swore that he was unemployed, that his receiver controlled all of his assets, that he had little money and few personal belongings, and that he was dependent on his children for support. Financial records attached to Moss' affidavit showed that his liabilities far outweighed his assets at the time of the contempt adjudication.
 
 
 20
 The district court was aware that Moss could not comply with an order to repay such a large sum of money, as evidenced by its comment at the first contempt hearing:
 
 
 21
 (I)t's obvious that he doesn't have the money to pay these people back or it is apparent to me, and I am sure that some of the people who have invested in this, it is apparent to them that they are going to lose in this situation.
 
 
 22
 Transcript at 34.
 
 
 23
 The court's remark indicates that it knew it was, in effect, requiring Moss to do the impossible in order to purge himself of contempt. In addition, the court recognized that the law allows such inability to comply to be a defense to contempt:
 
 
 24
 Well, in a civil matter to order that amount of money paid back without more assurance than I had that it would be paid back put the court in a rather bad position. People not familiar with the law do not understand why the court cannot just in this civil case incarcerate someone eternally for failing to do that (to pay). Well, you know as a lawyer that in a civil case, I can't do that. You know as I know, that if somebody ordered to pay that money comes in and shows that he or she is without funds and is without property, that you have to (sic) got to turn them loose.
 
 
 25
 Transcript at 249-50.
 
 
 26
 The court, then, appears to have simply attached no significance to Moss' affidavit, even though nothing else in the record indicates that Moss did have the financial ability to comply with the order.[3] In my opinion, the district court's action raises the specter of the debtor's prison this country long ago outlawed.
 
 
 27
 I would reverse.
 
 
 
 *
 Joe MacDonald Ingraham, Senior Circuit Judge, Fifth Circuit, Houston, Texas, sitting by designation
 
 
 [1]
 The complaint alleged violations of 15 U.S.C. § 77e(a) and (c), 15 U.S.C. § 77q(a), and 15 U.S.C. § 78j(b)
 
 
 [2]
 The consent judgment provided that:
 "the defendants are permitted to use their personal funds for reasonable and necessary living, secretarial, utility, travel, counsel fees, accountants (sic) fees, rent expenses ..." (emphasis added).
 Correlated Equities Corporation and Moss, individually, and d/b/a Television Marketing were further permitted to pledge, hypothecate, sell, assign, transfer or otherwise dispose of any assets for the purpose of funding the repayment or repaying the indebtedness of Television Marketing.
 
 
 [1]
 The Second Circuit had said, "Although we know that Maggio cannot comply with the order, we must keep a straight face and pretend that he can, and must thus affirm orders which first direct Maggio 'to do an impossibility, and then punish him for refusal to perform it.' " See 333 U.S. at 59, 68 S.Ct. at 403
 
 
 [2]
 The Court did point out, however, that Maggio tendered evidence of his earnings for the pertinent period, of his unemployment during part of that time due to failing health, and of his family obligations and manner of living during the intervening period. He also swore that he had no real or personal property which could be used to satisfy the trustee's demands and repeated his denial of possession
 
 
 [3]
 Interestingly enough and despite its earlier recognition that "it's obvious that (Moss) doesn't have the money to pay these people back or it is apparent to me," Transcript at 34, the district court nonetheless noted:
 I am sure what this (affidavit) says is that he doesn't have any funds. Well, I'm not going to be convinced at this time.
 Transcript at 252.