**Violet MOSS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 19016.**

Court of Civil Appeals of Texas, Dallas.

July 22, 1976.

Roy Johnson, Dallas, for appellant.

Henry Wade, Dist. Atty., Dallas County, William F. Denman, Asst. Dist. Atty., Dallas, for appellee.

GUITTARD, Justice.

After a jury trial the probate court ordered Violet Moss to be confined to a mental hospital for a period of ninety days for "observation and/or treatment." She appeals, complaining that the provisions of the Mental Health Code concerning temporary hospitalization, and particularly Tex. Rev.Civ.Stat.Ann. arts. 5547–27 to 5547–39d (Vernon 1958 and Vernon Supp.1975),[1] are unconstitutional because they deprive persons of their liberty without due process of law. Appellant also contends that the evidence is insufficient to support jury findings that she is "mentally ill" and that she "does require observation and/or treatment in a mental hospital for her own welfare and protection or the protection of others." We hold that appellant has not been denied due process in the respects alleged, but that the evidence is insufficient to support the verdict because the record does not show the factual information on which the medical witnesses based their recommendation of temporary hospitalization. Accordingly, we reverse the order and remand the cause for another hearing on the application for temporary hospitalization.

### I. *Necessity of Motion for New Trial*

■ Before discussing appellant's contentions, we must consider the State's objection that we have no jurisdiction of the matters presented because appellant filed no motion for new trial as required by Tex.R.Civ.P. 324 as a prerequisite to appeal in jury cases. We hold that rule 324 has no application to this proceeding.

■ The appeal is governed by § 39a of the Code, which provides:

The person ordered committed may appeal the Order of Temporary Hospitalization by filing written notice thereof with the County Court within five (5) days after the Order of Temporary Hospitalization is entered.

The Code further provides that when notice of appeal is filed the clerk "shall immediately send a certified transcript of the proceedings to the Court of Civil Appeals" (§ 39b), and that such cases "shall be advanced on the docket and given a preference setting over all other cases" (§ 39d). Expeditious disposition of such an appeal is appropriate in view of the deprivation of liberty involved and the fact that the period of temporary hospitalization authorized by § 38(b) is only ninety days.

The State argues that since § 39a concerns only the notice of appeal and contains no reference to a motion for new trial, the requirement of a motion for new trial in rule 324 is not affected. We do not so construe § 39a. It is reasonable to suppose that if the legislature had intended that a motion for new trial should be filed as provided by rule 324, it would have provided for the notice to be filed after entry of the order overruling such motion, as did Tex.R.Civ.P. 353 before the recent amend-

---

1. The articles of the Mental Health Code will be cited in this opinion by section numbers; for example, the articles mentioned above as §§ 27 to 39d.

ment eliminating the notice of appeal requirement, and as Tex.R.Civ.P. 356 and 386 provide with respect to filing the appeal bond, transcript, and statement of facts. Since § 39a makes no such provision, but rather provides that the notice must be filed within five days after entry of the order for hospitalization and that the transcript should be sent "immediately" to the appellate court, the evident intent is that the jurisdiction of the trial court should be suspended and that of the appellate court should "immediately" attach. It would be contradictory to hold that after the record is already filed in the appellate court, the trial court retains authority to act on a motion for new trial within the periods of time prescribed by Tex.R.Civ.P. 329b and that disposition of such a motion is a prerequisite to appeal.

## II. *The Due Process Attack*

■ Appellant argues that involuntary commitment of a person alleged to be mentally ill, although resulting from civil rather than criminal proceedings, is a deprivation of liberty that requires due process of law, citing *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), and *Heryford v. Parker,* 396 F.2d 393 (10th Cir. 1968). We agree that due process is required. Consequently, we must examine the grounds on which appellant asserts that the Mental Health Code deprives the proposed patient of due process.

These grounds must be considered in the light of the record in this case. On April 20, 1976, on filing of a sworn application by appellant's mother, appellant was arrested and confined in the Dallas County Mental Evaluation Center. Appellant promptly employed counsel, who notified the Mental Evaluation Center that appellant did not consent to any mental examination. Nevertheless, on the next day, the probate judge signed an ex parte order appointing two physicians to examine her, requiring her to submit to such examination, and setting a hearing six days later. Notice of this order, together with a copy of the application, was immediately served on appellant. On the same day, April 21, she was examined by the two physicians so appointed, and on April 26 she was examined by another physician. All of the physicians signed and filed certificates stating that appellant was mentally ill, that she was likely to cause injury to herself or others if not immediately restrained, and that she required observation and treatment in a mental hospital.

The hearing was held on April 30 before the court and a jury, with appellant present. Her counsel participated and provided vigorous representation. After hearing the testimony of appellant's mother and two of the physicians who had filed certificates, the court submitted special issues to the jury, and, based on the jury's answers, the court signed an order committing appellant to a mental hospital "for observation and/or treatment."

### 1. *Notice to Patient*

■ The first ground of the due process attack is that the Code permits a person to be incarcerated without personal notice to him since it permits notice to be waived by any responsible relative. This argument is based on a misreading of the Code. Section 33 provides:

The proposed patient shall be personally served with a copy of the Application and written notice of the time and place of hearing thereon and of the order, if any, to submit to an examination for mental illness. A copy of the Application and notice shall be sent by registered mail to the guardian or a responsible relative of the proposed patient.

Under this provision, notice to the relative is not a substitute for personal service on the proposed patient, but is an added safeguard. The relative may waive notice to himself, but not notice to the proposed patient. The record in this case shows that § 33 was fully complied with by personal notice to appellant as well as by a waiver of notice signed by her mother. We see no problem of due process in this respect.

### 2. *Attorney Ad Litem*

■■ The second ground is that the only legal representation guaranteed to the pro-

posed patient is the appointment of an attorney ad litem, who is not in a true adversary position with respect to the State because, like the State, he is supposed to represent the "best interests" of the proposed patient rather than to act as the proposed patient's advocate in defense of his liberty. We find nothing in the Code that would deprive the proposed patient of representation by counsel of his own choice or that would prevent an appointed attorney from providing true adversary representation. Section 33 provides:

> When such application is filed, the county judge shall simultaneously appoint an attorney ad litem, if there is no attorney representing the proposed patient. Such attorney shall be furnished with all records and papers in said cause together with access to all the hospital and doctors' records in said cause.

We recognize that appointed counsel may not always provide adequate representation.[2] No such problem is raised here, however, because the record shows that appellant had counsel of her choice, who provided able representation from the time of her arrest. Even if the Code should be held deficient in failing to guarantee adequate counsel to one not represented by counsel of his own choice, a person represented by his own chosen counsel has no standing to challenge the validity of the Code on that ground. Cf. Bode v. Barrett, 344 U.S. 583, 586, 73 S.Ct. 468, 471, 97 L.Ed. 567 (1953); Houston Oil Co. of Texas v. Lawson, 175 S.W.2d 716, 720 (Tex.Civ.App., Galveston 1943, writ ref'd); Waco v. Landingham, 158 S.W.2d 79, 81 (Tex.Civ.App., Waco 1940, writ ref'd).

### 3. Jury Verdict

 The third ground is that the proposed patient can be "convicted" by a five-to-one vote of a county-court jury. This point was not raised by objection to the court's charge. In any event, it is untenable because even in a criminal case due process does not require either a jury of twelve, Williams v. Florida, 399 U.S. 78, 103, 90 S.Ct. 1893, 1907, 26 L.Ed.2d 446 (1970), or a unanimous verdict, Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972).

### 4. Standard of Proof

 The fourth ground is that the Code permits the proposed patient to be "convicted" by proof by a preponderance of the evidence rather than by proof beyond a reasonable doubt. The Code does not specify the standard of proof, but the special issues submitted required the jury to make its findings "from a preponderance of the evidence." No objection was made to the charge on this ground. Consequently, this error, if it was an error, is not ground for reversal.

 Nevertheless, since we remand the case for another hearing for insufficiency of the evidence, it is appropriate to determine whether "a preponderance of the evidence" is the proper standard of proof. The Code is not itself subject to attack for failure to specify the standard of proof. Greene v. State, 537 S.W.2d 100, 102 (Tex. Civ.App., Houston [1st Dist.] 1976, no writ). Traditionally this question has been left to the judiciary to resolve. Woodby v. Immigration and Naturalization Service, 385 U.S. 276, 284, 87 S.Ct. 483, 487, 17 L.Ed.2d 362 (1966). Some of the federal courts have held that a civil commitment for mental illness requires proof beyond a reasonable doubt, at least when the commitment is for a long or indefinite period. In re Ballay, 157 U.S.App.D.C. 59, 482 F.2d 648, 653–669 (1973); Lessard v. Schmidt, 349 F.Supp.

---

**2.** See the following discussions of this problem: Cohen, The Function of the Attorney and the Commitment of the Mentally Ill, 44 TEXAS L.REV. 424–459 (1966); Brunetti, The Right to Counsel, Waiver Thereof, and Effective Assistance of Counsel in Civil Commitment Proceedings, 29 SW.L.J. 684, 708 (1975); Litwack, Role of Counsel in Civil Commitment Proceedings: Emerging Problems, 62 CALIF.L.REV. 816–839 (1974); The Role of Counsel in Civil Commitment Process: A Theoretical Framework, 84 YALE L.J. 1540–1563 (1975).

1078, 1095 (E.D.Wis.1972), *vacated on other grounds,* 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975). Justice Douglas took this position in his dissenting opinion in *Murel v. Baltimore City Criminal Court,* 407 U.S. 355, 358, 92 S.Ct. 2091, 2093, 32 L.Ed.2d 791 (1972). Other courts have held that no particular standard of proof is constitutionally required. *Tippett v. Maryland,* 436 F.2d 1153, 1159 (4th Cir. 1971), *cert. dismissed as improvidently granted, sub nom. Murel v. Baltimore City Criminal Court,* supra; *cf. Purks v. State,* 226 Md. 43, 171 A.2d 726, 728 (1961). Still other authorities have adopted the view that more than a bare preponderance of the evidence is required to deprive a person of his liberty, but that proof "beyond a reasonable doubt" is virtually unattainable at this stage in the development of psychiatric medicine on the issue of a person's subjective mental condition and the probability that he will be dangerous in the future. Accordingly, these authorities require proof "by clear, unequivocal and convincing evidence," which is considered to be "the highest degree of certitude reasonably attainable in view of the nature of the matter at issue." *Lynch v. Baxley,* 386 F.Supp. 378, 393 (M.D. Ala.1974); *Dixon v. Attorney General of Pennsylvania,* 325 F.Supp. 966, 974 (M.D.Pa. 1971); Comment, *Civil Commitment of the Mentally Ill: Theories and Procedures,* 79 Harv.L.Rev. 1288, 1291 (1966); Comment, *Due Process for All—Constitutional Standards for Involuntary Civil Commitment and Release,* 34 U.Chi.L.Rev. 633, 654–59 (1967); Note, *Due Process and the Development of "Criminal" Safeguards in Civil Commitment Adjudications,* 42 Fordham L.Rev. 611, 624–25 (1974); and *see Tippett v. Maryland, supra,* Sobeloff, J., concurring and dissenting at 1164–1166; [3] *Cf. In re Mastin,* 521 S.W.2d 150, 152 (Tex.Civ.App. Dallas 1975, no writ), in which this court did not determine the standard of proof, but noted that the State conceded that it should be proof by "clear, unequivocal and convincing evidence."

■ We approach the question from the viewpoint of sound administration of justice as well as from the viewpoint of due process. After reviewing the above authorities, we conclude that proof beyond a reasonable doubt is not constitutionally required in temporary hospitalization proceedings, in which the mental condition of the proposed patient has not been finally determined and the issue is whether he should be "committed as a patient for observation and/or treatment in a mental hospital for a period not exceeding ninety (90) days" under § 38(b) of the Mental Health Code. Since one of the purposes of temporary hospitalization is "observation," the evident intent is to afford opportunity at a later stage for the attainment of a higher degree of certainty in the diagnosis and recommended treatment than is attainable within the time allowed for an order of temporary hospitalization. On the other hand, even a commitment for ninety days is a serious deprivation of liberty and may have grave consequences for a person not mentally ill or whose variance from normal standards of behavior is not of such a serious nature as to require confinement. Even at this stage, the necessity for involuntary hospitalization should be reasonably clear. Consequently, we hold that an order for temporary hospitalization under § 38 must be based on "clear, unequivocal, and convincing proof," and that on another hearing the jury should be so instructed.

### 5. Secrecy of Hearing and Presence of Patient

■ The fifth ground is that the "mechanics are present for secret trials without the presence of the accused." In this connection, complaint is made of the following provisions of § 36:

(a) The Judge may hold the hearing on an Application for Temporary Hospitalization at any suitable place within the county. The hearing should be held in a physical setting not likely to have a harmful effect on the mental condition of

**3.** This standard of proof was adopted for deportation proceedings in *Woodby v. Immigra-* *tion and Naturalization Service,* 385 U.S. 276, 284, 87 S.Ct. 483, 487, 17 L.Ed.2d 362 (1966).

the proposed patient in the event he is present.

(b) The proposed patient is not required to be present at the hearing, but he shall not be denied the right to be present.

(c) The Court may exclude all persons not having a legitimate interest in the proceedings, provided the consent of the proposed patient first shall have been obtained.

This section does not provide that the hearing may be had in the absence of the proposed patient, if he wishes to be present, or that anyone may be excluded from the hearing over his objection. The record in the present case fails to show that the hearing was held in appellant's absence or that any person was excluded. Consequently, no denial of due process in this respect is shown.

### 6. *The Privilege Against Self-Incrimination*

The most difficult question presented is that raised by appellant's sixth ground, which attacks the provision of § 32 of the Code authorizing the judge to order the proposed patient to submit to a psychiatric examination. This section provides:

(a) Before a hearing may be had on an Application for Temporary Hospitalization there must be filed with the county court Certificates of Medical Examination for Mental Illness by two (2) physicians who have examined the proposed patient within five (5) days of the filing of the Certificate, each stating that the proposed patient is mentally ill and requires observation and/or treatment in a mental hospital.

(b) If the Certificates of two (2) physicians are not filed with the Application, the county judge shall appoint the necessary physicians, at least one of whom shall be a psychiatrist if one is available in the county, to examine the proposed

patient and file Certificates with the county court. *The judge may order the proposed patient to submit to the examination.* [Emphasis added.]

Acting pursuant to this section, the probate judge appointed two physicians to examine appellant and ordered her to submit to such examinations. The examinations proceeded notwithstanding notice by appellant's counsel that appellant did not consent. The examining physicians were permitted to testify at the hearing, over appellant's objection, concerning their diagnosis and recommendations based on information obtained from appellant in these examinations.

Appellant argues that since involuntary hospitalization is a deprivation of liberty, the proposed patient has the same privilege to refuse to give evidence against himself as a person accused of a crime. Consequently, she insists, to order a person to submit to the interrogation involved in a psychiatric examination, as implied by § 32(b), requires him to give evidence against himself, thus depriving him of his liberty contrary to the fifth and fourteenth amendments to the Constitution of the United States.[4]

We are not concerned with whether a person ordered to submit to a psychiatric examination under § 32(b) may refuse to divulge information that might be used against him in a criminal prosecution. For the purpose of this opinion, we assume that he may claim the privilege to this extent. *Lynch v. Baxley*, 386 F.Supp. 378, 394 (M.D. Ala.1974); *People v. English*, 31 Ill.2d 301, 201 N.E.2d 455, 459 (1964). Our question is whether he may refuse to answer any or all questions put to him by the appointed psychiatrist or other physician on the ground that his answers may be used against him in a civil commitment proceeding.

We have found only one decision holding that the privilege against self-incrimination

4. The fifth amendment, which is made applicable to the states by the fourteenth amendment, *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), provides that no person "shall be compelled in any criminal case to be a witness against himself." The same question arises under Tex.Const. art. I, § 10: "In all criminal prosecutions the accused . . . shall not be compelled to give evidence against himself."

applies in this situation. In *Lessard v. Schmidt*, 349 F.Supp. 1078, 1100–02 (E.D. Wis.1972), *vacated on other grounds*, 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), a three-judge federal district court made a broad review of the Wisconsin commitment procedure and held that statements to a psychiatrist, unless made voluntarily after notice of the possible consequences, cannot be the basis for an order of commitment, since such statements are incriminating in effect. Other authorities have seen a distinction between criminal prosecutions and civil commitment proceedings, in that the principal issue in a civil commitment proceeding is present mental condition rather than past anti-social activity, and have adopted the view that to recognize the privilege in this situation would deprive the court of the best and most reliable evidence, *Tippett v. Maryland*, 436 F.2d 1153, 1160–1162 (4th Cir. 1971), *cert. dismissed as improvidently granted, sub nom. Murel v. Baltimore City Criminal Court*, 407 U.S. 355, 92 S.Ct. 2091, 32 L.Ed.2d 791 (1972); *Greene v. State*, 537 S.W.2d 100, 103 (Tex.Civ.App., Houston [1st Dist.] 1976, no writ); *cf. Lynch v. Baxley*, 386 F.Supp. 378, 394 (M.D.Ala.1974), and *People v. English*, 31 Ill.2d 301, 201 N.E.2d 455, 459 (1964), in which the privilege was apparently confined to statements that might be used in a criminal prosecution.

The Supreme Court passed up an opportunity to decide this question in *McNeil v. Director, Patuxent Institution*, 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972), although Justice Douglas, in a dissenting opinion, seems to adopt the view that the privilege is applicable.[5]

Any adequate analysis of the problem must take into account the decision of the Supreme Court in *In re Gault*, 387 U.S. 1, 42–57, 87 S.Ct. 1428, 1451–59, 18 L.Ed.2d 527 (1967). There the Court held the privilege to be applicable in juvenile delinquency cases notwithstanding the argument that such proceedings are civil in nature and are undertaken for the benefit of the child. The Court observed that proceedings which may lead to commitment to a state institution must be regarded as "criminal" for purposes of the privilege against self-incrimination. Consequently, the Court held that an admission by the juvenile could not be used against him in the absence of clear and unequivocal evidence that the admission was made with knowledge that he was not obliged to speak and would not be penalized for remaining silent.

*Gault*, however, does not support the view that any legal process which threatens to deprive a person of his liberty necessarily requires the same constitutional protections as a criminal prosecution. The Court was careful to state that it did not mean to hold that an adjudication of delinquency "must conform with all the requirements of a criminal trial," but merely "that the hearing must measure up to the essentials of due process and fair treatment." 387 U.S. at 30, 87 S.Ct. at 1445. The problem, said the Court, "is to ascertain the precise impact of the due process requirement upon such proceedings."

The Supreme Court's unwillingness to apply criminal due process requirements inflexibly to all proceedings involving involuntary incarceration is demonstrated in *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971), in which the Court held that due process does not require trial by jury in a juvenile delinquency case. Likewise, in *Morrissey v. Brewer*,

---

5. Detailed discussion of the privilege in the context of civil commitment may be found in a number of law-review articles: Aronson, *Should the Privilege Against Self-Incrimination Apply to Compelled Psychiatric Examinations?* 26 Stan.L.Rev. 55–93 (1973); A. Dershowitz, *Preventive Confinement, A Suggested Framework for Constitutional Analysis*, 51 Tex.L.Rev. 1277, 1314–1316 (1973); *Civil Commitment of the Mentally Ill*, 87 Harv.L.Rev. 1190, 1303–1313 (1974); *Lessard v. Schmidt, Due Process and Involuntary Commitment*, 68 NW. U.L. Rev. 585, 617–623 (1973); Fielding, *Compulsory Psychiatric Examination in Civil Commitment and the Privilege Against Self-Incrimination*, 9 Gonz.L.Rev. 117, 126–127, 158, 165 (1973); *see also* 8 Wigmore on Evidence (McNaughton rev. 1961) § 2251.

408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), which involved the application of due process guarantees to proceedings for revocation of parole, the Court reaffirmed previous declarations that due process is flexible and calls for such procedural protection as the particular situation demands, and that a determination of what process is due requires a determination of the precise nature of the governmental function involved and the private interest affected.

We are persuaded that the balance of the competing public and private interests with respect to the privilege of withholding information from the court in a civil commitment proceeding differs substantially from the balance struck in *Gault* for juvenile delinquency proceedings. In *Gault,* the Court emphasized the possibility that the juvenile's admissions of guilt might be used against him in a criminal prosecution if the juvenile court should exercise its discretion to relinquish its jurisdiction to the ordinary criminal courts. 387 U.S. at 50–51, 87 S.Ct. at 1456. The Court's conclusion that a juvenile should have no less constitutional protection than an adult charged with the same criminal acts seems to have been influenced by the fact that the points considered by the trial court differed little from those that would have been involved in determining any charge of violation of a penal statute by an adult. The Court seems to have given weight also to the circumstance that the offense involved would have been only a misdemeanor if committed by an adult. 387 U.S. at 28–30, 87 S.Ct. 1444–45. The major ground of the decision, however, appears to rest on the Court's analysis of the rationale underlying the privilege against self-incrimination. According to the prevailing opinion by Justice Fortas, the privilege is based on the assumption that the confession of a criminal act is basically untrustworthy unless shown to be entirely voluntary. The Court reasons that if a confession of crime is untrustworthy in the case of an adult, it is even more so in the case of a child, as illustrated by the examples cited of children who confessed to crimes they did not commit. 387 U.S. 44–56, 87 S.Ct. 1453–59.

■ In our opinion the considerations deemed controlling in *Gault* do not apply with the same force when the issue is not a past act, which can be established by the testimony of an ordinary witness, but a present mental condition, which can be adequately described and evaluated only with the assistance of experts. There is little danger that the statements of the proposed patient to the examiner will be taken as evidence in a subsequent criminal proceeding, since the privilege is admittedly applicable to that extent. So far as untrustworthiness is concerned, the opinion of a physician based on the patient's statements to him is likely to be more reliable than the opinion of the same physician if based on the statements of other witnesses who must rely on their own casual and untrained observation. Although an examination ordered by the court may be coercive to some extent, particularly if the patient is under detention, no particular answer is as likely to be coerced as when the inquiry is whether the person in question committed a particular criminal act. Consequently, we do not consider such a compelled examination inhumane or likely to produce an untrustworthy result to the same extent as a confession of crime elicited by interrogation of an accused person in custody of the police.

■ Indeed, a mental examination by a psychiatrist or other physician may properly be regarded as a protection for a person alleged to be mentally ill. The people of Texas have recognized this protection by including in their Bill of Rights a provision that "no person shall be committed as a person of unsound mind except on competent medical or psychiatric testimony." Tex.Const. art. I, § 15–a. This provision is a strong declaration of the public policy of this state concerning the necessity of expert testimony in a civil commitment proceeding. Without this guarantee, a person who is merely eccentric may be committed to an institution against his will on the basis of

testimony by misguided or unscrupulous persons who are neither enlightened nor restrained by the training, experience, and standards of the medical profession. This guarantee would be substantially weakened, and perhaps nullified, if the physician or psychiatrist is provided no opportunity to employ the procedures recognized in the profession for diagnosing the problems of the mentally disturbed patient.

■ The psychiatric interview, as we understand it, is highly important to proper diagnosis and treatment of a mentally disturbed patient. In a case of physical illness, the physician consulted would be at a serious disadvantage if he is required to make a diagnosis and prescribe a treatment without examining the patient and hearing at first hand the patient's own account of his history and complaints. A psychiatrist or other physician consulted about suspected mental illness is at an equal if not greater disadvantage if he is required to make a diagnosis and recommendation without a direct interview with the patient, since the only manifestation of mental illness may be the patient's revelation of his own mental processes. An opinion based on an interview is likely to be more reliable than one based entirely on information related to the physician by the patient's family or other related persons or one expressed in court in response to a hypothetical question based on the testimony of other witnesses. Thus the constitutional guarantee of "competent medical or psychiatric testimony," reasonably implies a proper opportunity to examine the patient and affords substantial protection against deprivation of liberty, even to a person unwilling to submit to such examination. Certainly a proposed patient who may be dangerous to himself or others should not be able to avoid restraint by refusing to submit to the examination necessary to satisfy the requirements of the Texas Constitution and Mental Health Code.

■ We recognize, of course, that the fourteenth amendment right of due process takes precedence over the provision of our Texas Bill of Rights, but, as the Supreme Court of the United States has recognized in the cases above discussed, due process is a flexible concept requiring a balancing of interests. The interest of the individual in maintaining his liberty must be balanced against the interest of the state in protecting its citizens against injury from mentally disturbed persons, and also against the state's interest in providing care and treatment for mentally disturbed persons unable to appreciate the necessity for hospitalization. On striking that balance in the light of the foregoing considerations, we conclude that due process does not require an absolute privilege against providing information in a psychiatric interview that may be used by the interviewer as basis for his recommendation for hospitalization, but rather requires safeguards to assure that such interviews are not employed as instruments of abuse or oppression.

■ We are convinced that the Texas commitment procedure has adequate safeguards against abuse in the conduct of mental examinations. Section 32 of the Code provides for the filing of certificates of two physicians, based on recent examinations of the proposed patient, before a hearing is held. Section 33 provides that the patient's attorney, whether selected by him or appointed by the court, "shall be furnished with all records and papers in said cause together with access to all the hospital and doctors' records in said cause." These provisions give assurance that a patient will not be deprived of his liberty because of the incompetence or unscrupulousness of a single examining physician. The ethical standards of the medical profession provide a measure of protection that may not be available in other types of interrogation, such as that in *Gault,* where the Supreme Court was prompted to regard the juvenile's admission of guilt as untrustworthy. The effectiveness of those standards is increased by requiring an examination and certificate by more than one physician.

Another safeguard provided by the Code and by the Texas Constitution is the requirement of a legal as well as a medical determination of the necessity for commitment. Under § 38, an order of temporary hospitalization must rest on the court's own findings or the findings of a jury if a jury has been demanded. For reasons to be stated in our discussion of the sufficiency of the evidence in this case, this legal determination must be based on factual information supporting the expert opinion; thus, the physician's conduct of the interview is subject to scrutiny by the court. Other safeguards, not urged here, may be imposed by judicial decision if appropriate or constitutionally required.[6]

We have no occasion to consider what sanctions are available if the proposed patient fails to appear for the interview or refuses to answer questions, since, in the present case, the appellant did respond to questions although the examinations were made over the objection of her counsel. We realize, however, that problems of this kind may arise. Cf. McNeil v. Director, Patuxent Institution, 407 U.S. 245, 251, 92 S.Ct. 2083, 2087, 32 L.Ed.2d 719 (1972). Neither do we decide here whether the proposed patient may be called by the State as witness and required to give evidence against himself at the hearing. We hold only that the due process clause of the fourteenth amendment does not forbid an order to submit to these examinations, as provided by § 32(b), and that testimony of the examining physician based on information obtained at such an examination may be admitted in evidence at the commitment hearing.

### III. Sufficiency of Evidence

We turn now to appellant's contention that the evidence is insufficient to support the jury's findings that appellant is "mentally ill" and that she "does require observation and/or treatment in a mental hospital for her own welfare and protection or the protection of others." Consideration of this contention requires a review of the evidence.

The State called as its only witnesses appellant's mother, who had signed the application for voluntary hospitalization, and Dr. Marjorie Sewell, one of the physicians who had examined the plaintiff in the Mental Evaluation Center. Appellant's mother testified that during the sixty days before she had made the application appellant had been living with her and that she had observed appellant during that period. She said that shortly before the application was made she and appellant were in the kitchen and appellant said, "I'm getting a flash and I could knife you." For more than a month before that incident, appellant had not bathed, had stayed in bed or on the sofa, rising only for meals, and had refused to see anyone. Her mother had tried to persuade appellant to secure some sort of mental treatment, but appellant had refused and had become hostile whenever the subject was mentioned. The mother further testified that in her opinion, based on her observation over this sixty-day period, appellant was mentally ill, and was dangerous to herself and to her mother.

Dr. Marjorie Sewell testified that she was a physician with special training and experience in the field of mental health. She had examined plaintiff on April 26 after her arrest and detention on April 20. She did not record the length of time she was with appellant, but said that such interviews usually take fifteen or twenty minutes. She testified that on the basis of the examination and interview, she diagnosed appellant's condition as "chronic schizophrenia," a form of mental illness. She recom-

---

**6.** These may include the presence of the patient's own psychiatrist or attorney, if demanded, or, alternatively, making a complete record of the interview available to the patient's counsel. Lessard v. Schmidt, supra at 1100. Cf. Heryford v. Parker, 396 F.2d 393, 396 (10th Cir. 1968); but cf. also Lynch v. Baxley, 386 F.Supp. 378, 389 (M.D.Ala.1968), note 5. See also Aronson, supra, note 5, at 91. Restrictions on mental examinations when the patient is under the influence of psychoactive medication may also be advisable.

mended as treatment a temporary period of hospitalization, and said that she would not recommend treatment as an outpatient. In her certificate filed with the court, she stated that in her opinion appellant was likely, because of mental illness, to cause injury to herself or others if not immediately restrained. She testified that this opinion was based on appellant's "delusional thinking," which was "disassociated from reality."

Dr. Raymond Brown, a psychiatrist, was called by appellant as an adverse witness. On examination by appellant's counsel, Dr. Brown admitted that counsel had talked to him by telephone before he examined appellant and that he knew that appellant had been advised by counsel to remain silent, but that he proceeded with the interview. On examination by counsel for the State, Dr. Brown testified that he took from appellant a history, including the fact that she had previously been committed many times for mental illness. Based on that history and his examination, he testified that appellant was mentally ill at the time he examined her, and he recommended hospitalization. He diagnosed her condition as a "paranoid state" and found that she "was a potential danger to herself and others." This finding of dangerousness, he said, was based on a telephone call from another psychiatrist who had seen appellant earlier. Dr. Brown admitted that he had filled out a form after his examination of appellant in which he had checked "None" to the inquiry of "danger to self and others," and that he had made no affirmative indication in the spaces provided for noting "thoughts of sui-

cide," "suicidal behavior," "other self-destructive behavior," "recent thoughts of homicide," "homicidal behavior," and "other externally-directed destructive behavior." This doctor saw no inconsistency between his finding that appellant was not dangerous at the time he examined her and his conclusion that she was a "potential danger" for the future.

Appellant argues that the doctors' opinions were not competent because they were based on information obtained from the patient contrary to her privilege to remain silent. This ground is untenable because we hold, for reasons already stated, she had no such privilege. However, serious questions remain concerning sufficiency of the evidence.

▇▇▇▇ We conclude that this evidence is insufficient to support the jury's findings because it does not give the factual basis on which the medical opinions are based. A person suspected of mental illness ought not to be deprived of liberty on the basis of expert opinion alone. Such an opinion, although constitutionally required in Texas, as pointed out above, is not in itself enough to deprive a person of his liberty. If the conclusion of a psychiatrist were sufficient for a civil commitment, no necessity would exist for a court, with or without a jury, to make a judicial determination of the facts necessary for involuntary hospitalization. Section 32 of the Code requires examination by two physicians, but under §§ 37 and 38, if temporary hospitalization is opposed, the court must hear testimony and make its own findings.[7] Trial by jury is required if

---

7. *Art. 5547–37 Findings on Certificates*

If at the hearing no one opposes temporary hospitalization of the proposed patient, the court may make its findings upon the basis of the Certificates of Medical Examination for Mental Illness on file with the court.

*Art. 5547–38 Order upon Hearing*

(a) If upon the hearing the court finds that the proposed patient is not mentally ill or does not require observation and/or treatment in a mental hospital, the court shall enter its order denying the Application and shall order the immediate release of the proposed patient if he is not at liberty.

(b) If upon the hearing the court finds that the proposed patient is mentally ill and requires observation and/or treatment in a mental hospital for his own welfare and protection or the protection of others, the court shall order that the mentally ill person be committed as a patient for observation and/or treatment in a mental hospital for a period not exceeding ninety (90) days.

(c) If upon the hearing the court finds that the proposed patient is mentally ill and requires observation or treatment for his own welfare and protection or the protection of others but that the required observation or treat-

demanded by the patient. Tex.Const. art. I, § 15–a; Mental Health Code § 36(e).

■ We interpret these provisions of the Code and the Constitution as requiring both a medical and a legal determination of the grounds on which the proposed patient is to be deprived of his liberty. The rationale for requiring a legal determination has been stated by the Supreme Court of the United States with respect to a similar statute of Wisconsin as follows:

> Since 1880, Wisconsin has relied on a jury to decide whether to confine a person for compulsory psychiatric treatment. Like most, if not all, other States with similar legislation, Wisconsin conditions such confinement not solely on the medical judgment that the defendant is mentally ill and treatable, but also on the social and legal judgment that his potential for doing harm, to himself or to others, is great enough to justify such a massive curtailment of liberty. In making this determination, the jury serves the critical function of introducing into the process a lay judgment, reflecting values generally held in the community, concerning the kinds of potential harm that justify the State in confining a person for compulsory treatment.

*Humphrey v. Cady,* 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972).

■ In order for the jury to make a "lay judgment, reflecting values generally held in the community concerning the kinds of potential harm that justify the State in confining a person for compulsory treatment," the factual data supporting the medical opinion should be shown by the evidence. Expert testimony that a person's condition has been diagnosed as "chronic schizophrenia" or "paranoid state" does not

advise the jury whether hospitalization is necessary. Neither does an opinion that a person is "potentially dangerous," without more, warrant confinement, if that person has never done violence to himself or anyone else. Unless opinions such as these are supported by statements of the behavior on which they are based, the court does not have sufficient information to make a proper legal determination of whether the potential harm is great enough to justify depriving the person of his liberty.

■ The inherent weakness of the conclusions of psychiatrists on the issue of dangerousness in civil commitment proceedings, when offered without supporting data, has been judicially recognized. *In re Barnard,* 147 U.S.App.D.C. 302, 455 F.2d 1370, 1375 (1971); *Cross v. Harris,* 135 U.S.App. D.C. 259, 418 F.2d 1095, 1099–1101 (1969); *Millard v. Harris,* 132 U.S.App.D.C. 146, 406 F.2d 964, 968 (1968). The same weakness has been recognized when such testimony has been offered on the issue of insanity in criminal cases. *Washington v. United States,* 129 U.S.App.D.C. 29, 390 F.2d 444, 453–454 (1967); *Mims v. United States,* 375 F.2d 135, 140–146 (5th Cir. 1967); *Dusky v. United States,* 295 F.2d 743, 754–755 (8th Cir. 1961); *Blocker v. United States,* 110 U.S.App.D.C. 41, 288 F.2d 853, 863 (1961, Burger, J., concurring),[8] cert. den., 375 U.S. 923, 84 S.Ct. 269, 11 L.Ed.2d 167 (1963); *Carter v. United States,* 102 U.S.App.D.C. 227, 252 F.2d 608, 617 (1956). It has even been seriously argued on the basis of case studies that psychiatric opinions, diagnoses, and predictions are so inaccurate and unreliable that they should not even be admissible in civil commitment proceedings, and that the testimony of psychiatrists should be limited to descriptive statements of what the psychiatrist has personally observed.

ment can be accomplished without commitment to a mental hospital, the court may order the proposed patient to submit to other treatment, observation, or care as may be found by the court to be likely to promote the welfare or protection of the proposed patient and the protection of others. If the proposed patient fails to fulfill the terms of the court's order, the court may, on its own motion or on the motion

of any interested party, order that the mentally ill person be committed as a patient for observation or treatment in a mental hospital for a period not exceeding 90 days.

8. Judge Burger's view on this question was later adopted by the Court of Appeals in *Washington v. United States, supra.*

Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom,* 62 Calif.L.Rev. 693, 735–38 (1974). Although we do not go that far, we are not convinced that a psychiatrist, physician, or any other expert is sufficiently qualified by training or experience in the prediction of human behavior that his bare opinion of "potential danger" is sufficient to justify the court in depriving a person of his liberty. *See* Elliott, *Procedures for Involuntary Commitment on the Basis of Alleged Mental Illness,* 42 U.Colo.L.Rev. 231, 248 (1970); Bazelon, *Institutionalization, Deinstitutionalization and the Adversary Process,* 75 Colum.L.Rev. 897, 900–901 (1970); Ross, *Commitment of the Mentally Ill: Problems of Law and Policy,* 57 Mich.L. Rev. 945, 963 (1959).

In the present case, neither Dr. Sewell nor Dr. Brown gave any factual basis for their opinions. They testified that their diagnoses were based on statements that appellant had made to them, but they did not reveal what those statements were. Dr. Sewell testified that her opinion of appellant's potential dangerousness was based on appellant's "delusional thinking," which was "disassociated from reality," but she gave no indication of what beliefs appellant held that were "disassociated from reality," except to say that appellant has spoken of "anti-communist articles in St. Louis." Likewise, Dr. Brown's opinion of appellant's "potential danger" was extremely weak in view of the apparent inconsistency in his reports and the fact that his opinion in this respect was based on the hearsay statement of another psychiatrist.

■ The testimony of appellant's mother provides more factual information, but the record does not show that this information was available to either Dr. Sewell or Dr. Brown. The only specific evidence of appellant's dangerousness was her mother's testimony that appellant had told her, "I could knife you." However, the mother's testimony alone is not sufficient to support the jury's finding in view of the constitutional prohibition against commitment "ex-

cept on competent medical or psychiatric testimony." Tex.Const. art. I, § 15–a. This provision is implemented by § 32 of the Code, which requires examination and certification by two physicians before a hearing can even be held on an application for temporary hospitalization.

■ We conclude that when an application for temporary hospitalization is opposed by the prospective patient, the order of commitment must be supported by the recommendation of a physician and a showing of the factual information on which that recommendation is based. Since that factual information is not shown here, we hold that the evidence is factually insufficient to support the verdict. Accordingly, the order for temporary hospitalization is reversed and the cause is remanded to the probate court for another hearing. Meanwhile, it is ordered that all treatment of appellant for mental illness be discontinued and that she be returned to the Dallas County Mental Health Evaluation Center. It is further ordered that appellant be released from custody unless another hearing on the application for temporary hospitalization is set in accordance with § 33 of the Code within fourteen days after the filing of our mandate.

Reversed and remanded.