Wyline Elizabeth LODGE, Appellant,

v.

The STATE of Texas, Appellee.

No. 16284.

Court of Civil Appeals of Texas,
San Antonio.

Feb. 6, 1980.

Rehearing Denied April 9, 1980.

Ray Leach, Bill McKee, Legal Aid, San Antonio, for appellant.

John R. Heard, San Antonio, filed amicus curiae brief.

Bill M. White, Crim. Dist. Atty., Mitchell L. Weidenbach, Asst. Crim. Dist. Atty., San Antonio, for appellee.

CADENA, Chief Justice.

This is an appeal from an order of the trial court, sitting without a jury, directing that appellant, Wyline Elizabeth Lodge, be confined in a mental hospital for a period not exceeding 90 days. The order was based on findings that appellant is mentally ill "and requires observation and/or treatment in a mental hospital for his [sic] own welfare and protection or the protection of others." Such temporary involuntary commitment to a mental hospital is permitted by section 38(b) of the Texas Mental Health Code. Tex.Rev.Civ.Stat.Ann. art. 5547–38(b) (Vernon 1958 & Supp. 1980).

The State suggests that the case is moot because appellant was released from the hospital 13 days after she was committed. At the time she was discharged, however, appellant had already perfected her appeal to this Court.

The State, relying on *In Re Ivey*, 534 S.W.2d 163 (Tex.Civ.App.—Austin 1976, writ ref'd n. r. e.), and on two other decisions by Courts of Civil Appeals[1] which followed the *Ivey* holding, contends that the discharge of appellant from confinement terminated the existence of an actual controversy between the parties and rendered the cause moot; so that any opinion by this Court would amount to no more than an advisory opinion. We disagree.

■ There are two recognized exceptions to the mootness doctrine. The first exception was applied in *Southern Pacific Terminal Co. v. Interstate Commerce Commission*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911), which involved an attack on the validity of an order of the Interstate Commerce Commission. In rejecting the contention that the expiration of the order rendered the controversy moot, the Supreme Court pointed out that the short

---

1. *Winely v. State*, 556 S.W.2d 637 (Tex.Civ. App.—Austin 1977, no writ; *Hollifield v. State*, 545 S.W.2d 267 (Tex.Civ.App.—Fort Worth 1976, no writ). In both of these cases the question of mootness was disposed of by merely citing *Ivey*.

duration of orders such as the one before it would normally result in their expiration before review could effectively be accomplished. Under such circumstances, where the questions involved in the controversy are important and of a continuing nature, the mootness doctrine will not be applied. The Court described such controversies as "capable of repetition, yet evading review." *Id.* at 515, 31 S.Ct. at 283.

The *Southern Pacific Terminal* exception is applicable where the likelihood of the recurrence of a controversy of short duration is coupled with the presence of a paramount interest in assuring adequate appellate review of a dispute having public significance. *See Weinstein v. Bradford*, 423 U.S. 147, 148, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975); *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1940).

The lower federal courts have applied this exception in several cases involving involuntary civil commitments for mental illness. *See Rex v. Owens*, 585 F.2d 432, 435 (10th Cir. 1978). Appeals from temporary civil commitment orders are deemed to satisfy the "capable of repetition, yet evading review" requirement because the appellant generally suffers from recurring stages of mental illness which require short-term involuntary confinements which invariably expire before there is an opportunity for appellate review. *See In Re Ballay*, 482 F.2d 648, 651 (D.C.Cir.1973).

▮ The second exception to the mootness rule is generally referred to as the "collateral consequences doctrine." This exception is most often applied by the federal courts in criminal cases where the adverse collateral consequences of a criminal conviction are viewed as preserving the existence of the dispute although the convicted person has completely served the sentence imposed. *See, e. g., Sibron v. New York*, 392 U.S. 40, 55–56, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *Pollard v. United States*, 352 U.S. 354, 358, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957). In order to obtain a finding of mootness in such cases the prosecution must show that there is "no possibility" of adverse collateral consequences flowing from the conviction. 392 U.S. at 57, 88 S.Ct. 1889.

The collateral consequences doctrine has also been applied by lower federal courts in order to permit appellate review of temporary involuntary civil commitments after discharge of the petitioner from confinement. *See Justin v. Jacobs*, 449 F.2d 1017, 1018–20 (D.C.Cir.1971). The doctrine is applicable because the adverse collateral consequences of being adjudicated mentally ill remain to affect the patient long after his release. *See In Re Ballay*, 482 F.2d 648, 651–52 (D.C.Cir.1973).

Apparently, there are no Texas cases applying the *Southern Pacific Terminal* exception. In *Ivey*, the Austin Court of Civil Appeals referred to this exception, as well as the collateral consequences doctrine and, without discussion or explanation, refused to apply either to a case involving a temporary involuntary civil commitment for mental illness. The *Ivey* opinion merely referred to the cases in which one or the other of the two exceptions had been applied, and declared that the appeal was moot because appellant had been released from confinement, thus ending "the existence of an actual controversy" which "is essential to the exercise of appellate jurisdiction." 534 S.W.2d at 165.

The Texas Supreme Court declined to dismiss the collateral consequences doctrine as cavalierly as did the Court of Civil Appeals in *Ivey*. *Carrillo v. State*, 480 S.W.2d 612 (Tex.1972), involved an appeal by a minor from an order declaring him to be a delinquent child. Because the sentence had expired, the State argued, as it does here, that the case was moot. The Texas Supreme Court, relying on *Sibron v. New York, supra*, rejected the mootness contention, saying that a minor's right to appeal "should not be removed because the sentence given is so short that it expires before appellate steps [have been] completed or the probated sentence is lifted before such time." 480 S.W.2d at 617. The Court pointed to the stigma and collateral consequences which flow from an adjudication of

delinquency and declared that such consequences "may not be insignificant." Significantly, the holding that a minor must be given the right to clear himself by appeal, even after he had served his sentence, was reached after the Court had noted that in the "ordinary civil case" where the judgment of the trial court has been "voluntarily satisfied, such as by paying the money judgment, then the whole case is moot" and all judgments and orders are set aside. 480 S.W.2d at 616–17.

■ In *Ivey*, the *Carrillo* opinion was deemed worth nothing more than a passing reference as another case in which the collateral consequences doctrine had been applied. We conclude that the *Carrillo* rationale is applicable to a case involving temporary involuntary civil commitment to a mental hospital for a period not to exceed 90 days following a finding of "mental illness." The stigma and adverse consequence flowing from a judicial determination of mental illness are too well known to require repetition here. *See Lessard v. Schmidt*, 349 F.Supp. 1078, 1094 (E.D.Wis. 1972); Note, *Developments in the Law of Civil Commitment of the Mentally Ill*, 87 Harv.L.Rev. 1190, 1193–1201 (1974). The consequences of a commitment for mental illness are often barely distinguishable from those collateral consequences which flow from a conviction of crime, or an adjudication of delinquency in the case of a minor. *See State v. Turner*, 556 S.W.2d 563, 565–66 (Tex.1977); Comment, *Overt Dangerous Behavior as a Constitutional Requirement for Involuntary Civil Commitment of the Mentally Ill*, 44 U.Chi.L.Rev. 562, 563 (1977). A person who has been discharged from confinement following involuntary commitment to a mental hospital cannot be said to stand in the same position as one who has "voluntarily" satisfied a judgment in the "ordinary civil case."

■ Appellant's release from confinement in this case can have little or no effect on the consequences of a formal judicial declaration of mental illness. The certificate of discharge in this case recites merely that appellant was released because she had "received maximum hospital benefits." Assuming that mental illness can be "cured," the certificate of discharge does not purport to reflect that appellant has been cured. A recital that a person "has received maximum hospital benefits" may be no more than a euphemistic way of saying that the mental illness cannot be successfully treated with the equipment and facilities available at the place of involuntary detention or, worse, that the person's mental illness is "incurable." At best, such a statement is ambiguous concerning the realization of any benefits at all. It is not even a statement that the person "no longer requires hospitalization," which is one of the reasons provided by statute for release of patients from mental hospitals. *See* Tex.Rev.Civ. Stat.Ann. art. 5547–80 (Vernon Supp.1980).

The conclusion that appellant's discharge does *not* render the case moot finds further support in the fact that the record before us reveals at least one prior occasion on which appellate was involuntarily committed to a mental hospital and then released after being confined for about a week. The possibility of the repetition of involuntary confinement of appellant for periods too short to permit appellate review cannot be dismissed as being too remote to be considered.

Appellant challenges the legal and factual sufficiency of the evidence to support the order of involuntary confinement.

■ The State produced only one witness who testified concerning appellant's mental condition. Both the court and counsel used the title "doctor" in addressing this witness. However, there is no evidence indicating whether this witness was a general medical practitioner, a psychiatrist, or a holder of a doctorate in home economics or physical education. Nevertheless, since he testified that he had been "practicing" at the state mental hospital for about nine months and had been a "doctor" in the "field [he is] now in" for over four years, without identifying the "field," perhaps it may be safely assumed that this witness possessed some degree of expertise in the field of psychiatry.

In evaluating the testimony in this case we shall attempt to avoid placing undue emphasis on the fact that many questions, not all of which can be dismissed as trivial or unsubstantial, have been raised concerning the reliability and validity of psychiatric testimony in civil commitment hearings.[2]

On direct examination this witness merely testified that he had examined appellant on a certain date, concluding that "I feel that she is mentally ill and in need of hospitalization," without giving the length of time devoted to such examination and without detailing the nature of the examination.

The further testimony of this witness on cross-examination and redirect examination may be summarized as follows:

1. When appellant was admitted to the hospital she was "quite disturbed" and "talking constantly." She was "talking about her children; . . . about God" and "how her children were mistreating their children." There were no indications of family dispute.

2. Appellant was neatly dressed and groomed and her feelings were "appropriate." Her memory was intact concerning recent and remote events, and she "knew who she was, where she was, and the approximate time, year, the month, the day." She could not explain why she had been "readmitted" to the hospital.

3. The "only thing" appellant "was doing was engaging in a lengthy conversation about her religion . . . and her children. Persons who engage in such conversations about religion and their children are not in need of involuntary hospitalization "unless they are psychotic from manic depressive disease like she was and is." Al-

though the doctor's notes made no mention of the fact that appellant was psychotic and reflected that appellant had "been taking her medicine, . . . exhibited no hostility" and was cooperative, he pointed out that a patient "can be psychotic and cooperate."

4. He classified appellant as psychotic because she was "detached from reality." The important thing was not that she talked about her religion, but that she talked of her religion "in a particular way" which "was not based on reality." A person can be deeply interested in religion and be very much in touch with reality, but "if they think they are God, that is something else." Appellant had never said that she thought she was God, and the witness did not testify that he believed that she thought she was God. Her interest in religion "goes far beyond [the normal] when she's in these states."

5. The doctor testified that he knew members of Jehovah's Witnesses go from door to door "preaching and singing to people," but he said that such conduct was "probably the norm for that particular religion." He would not describe such conduct as being "out of the ordinary."

6. Appellant was "delusional," although the doctor had failed to include that fact in his notes. He defined "delusion" as "a false belief which cannot be attacked logically." Her delusional state was "not a majority of her symptomatology, and being manic-depressive you wouldn't necessarily have to be."

7. With respect to religious beliefs, miracles and spiritual experiences, people who are not delusional will "entertain the idea that something might not be true." Such

2. Mr. Chief Justice Burger, in a concurring opinion, said, "The Court appropriately takes notice of the uncertainties of psychiatric diagnosis and therapy, and the reported cases are replete with evidence of the divergence of medical opinion in this vexing area." *O'Connor v. Donaldson*, 422 U.S. 563, 579, 95 S.Ct. 2486, 2495, 45 L.Ed.2d 396 (1975). There is considerable disagreement as to what constitutes "mental disease" and "treatment." Szasz, *The Right to Health*, 57 Geo.L.J. 734

(1969). The reasons for questioning the assumption that psychiatrists are "expert" at resolving issues relevant to civil commitment proceedings, and that psychiatric opinions and terminology are helpful to judges and juries in reaching correct decisions in such proceedings are examined in Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom*, 62 Cal.L.Rev. 693 (1974).

religious beliefs "can be dealt with logically," and persons who are not delusional "would wind up saying, 'I believe.'" On the other hand, when a person says, "It is so absolutely," and this attitude "cannot be challenged logically in any shape or form, that's a delusion."

8. In addition to her religious delusions, which the witness never identified, appellant suffered from the delusion that her daughter was "mistreating" appellant's grandson. Although he classified this belief unequivocally as a delusion, he testified that he had made no effort to investigate for the purpose of determining whether appellant's belief concerning the mistreatment of her grandson was true or not. He classified it as a "delusion" because it could not be challenged by logic."

There is no evidence that appellant had ever engaged in conduct that could be classified as dangerous to herself or to others. There is evidence that she had not engaged in any acts of violence in the past.

The proceedings in question were initiated by appellant's son who objected to the fact that appellant was reading the Bible to her neighbors after disregarding his direction that she stop. He told her that if she did not stop he would call the police. When she ignored his request he called the police and appellant was taken into custody. She made no effort to resist arrest. The evidence indicates that the neighbors were listening to appellant without complaint.

Although the State's witness described appellant's religious beliefs as "delusions," he did not identify any particular belief which he, in the exercise of his expertise, had determined was a "false belief." Perhaps the most startling facet of his testimony was the fact that he described appellant's belief concerning her grandson as a delusion without attempting to determine the truth of such belief. He persisted in this contention even after it was pointed out to him that he did not know whether the belief was true or false.

*Banks v. State*, 570 S.W.2d 121 (Tex.Civ. App.—Austin 1978, no writ), appears to be the only case which can be considered as arguably supporting the theory that the testimony in this case is sufficient to support an order of involuntary confinement. In *Banks*, the sole witness was a medical doctor who testified that in his opinion, based on personal observation of and communication with the patient, the patient was suffering from schizophrenia, paranoid type, and was psychotic. According to the doctor, the patient was "disoriented in time, place, and person; . . . he was not dangerous . . . his behavior in an unstructured environment could not be predicted," and he required "observation and/or treatment in a mental hospital for his own protection." 570 S.W.2d at 122. Unlike the patient in *Banks*, appellant here was not "disoriented in time, place, and person." There is no evidence that appellant's behavior "in an unstructured environment could not be predicted." More importantly, there is no evidence that appellant required hospitalization for her own protection.

In *Moss v. State*, 539 S.W.2d 936, 947–50 (Tex.Civ.App.—Dallas 1976, no writ), the court held that a mentally ill person could not be deprived of his liberty without a strong showing of a substantial threat of future harm founded on actual dangerous behavior manifested by some overt threat or act in the recent past; and that absent such evidence of "dangerousness," the fundamental right of the individual to be free of confinement outweighs the State's interest in forced commitment. In *Moss* two doctors testified that the patient was "potentially dangerous," but they furnished no specific reasoning in support of their conclusion. The court characterized such opinions as "inherently weak." The theory that a person should not be temporarily deprived of his liberty solely on the opinion of two doctors, unsupported by factual information, was approved in *State for Interest and Protection of Ellenwood*, 567 S.W.2d 251, 254 (Tex.Civ.App.—Amarillo 1978, no writ). It is true that such statement was dictum, since in *Ellenwood* the order of involuntary commitment was upheld. In *Ellenwood*, however, physicians testified that the pa-

tient was suffering from paranoid schizophrenia, and that persons suffering from that type of mental illness were dangerous to others. In addition, other witnesses testified concerning repeated outbursts of violence by the patient.

The State contends that evidence of dangerousness is not required in order to justify the involuntary commitment of a person. In *State v. Turner, supra,* the Texas Supreme Court said, "The involuntary mental patient is entitled to treatment, to periodic and recurr[ing] review of his mental condition, and to release at such time as he no longer presents a danger to himself or others." 556 S.W.2d at 566. Concededly, the *Turner* statement concerning dangerousness must be classified as dictum and the case dealt with an indefinite, rather than a temporary commitment. But no valid distinction can be based on a supposed difference between indefinite and temporary commitments, since in either case the statutes require a finding that the individual requires confinement in a mental hospital "for his own welfare and protection or the protection of others." *Compare* Tex.Rev. Civ.Stat.Ann. art. 5547–38(b) *with* art. 5547–51(a)(2). It would be nonsense to say that a person may be involuntarily confined without a finding of dangerousness and to add, in the next breath, that if he is not a danger to himself or to others he must be released.

 A holding that the Texas involuntary commitment statutes do not require a finding that the individual is a danger to himself or others would raise serious constitutional questions. *See* Comment, *Overt Dangerous Behavior as a Constitutional Requirement for Involuntary Civil Commitment of the Mentally Ill,* 44 U.Chi.L.Rev. 562 (1977). We need not decide here whether proof that an individual requires hospitalization "for his own welfare and protection or the protection of others" re-

quires evidence of dangerousness, since in this case, as already mentioned, there is no testimony which even tends to indicate that hospitalization of appellant is required for her own welfare and protection or the protection of others. Evidence which merely reflects that the individual "is mentally ill and in need of hospitalization" is no evidence that the statutory standard has been met.[3]

There being no evidence that appellant is in need of hospitalization for her "own welfare and protection or the protection of others," the judgment of the trial court is reversed and judgment is here rendered in favor of appellant.

---

**3.** "If the rights of any class of person should be more closely and sacredly guarded than another, it is that unfortunate individual who, rightfully or wrongfully, is charged with having a mind diseased or a reason dethroned. The unfortunate . . . [has] the right to insist upon compliance with every form prescribed by law, which has been enacted for the protection and preservation of his liberty." *Clark v. Matthews,* 5 S.W.2d 221, 222 (Tex.Civ.App.— San Antonio 1928, no writ).