IN THE SUPREME COURT OF TEXAS
 
════════════
No. 09-0236
════════════
 
The State of Texas, 
Petitioner,
 
v.
 
K.E.W., Respondent
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the First District of 
Texas
════════════════════════════════════════════════════
 
 
Argued February 
18, 2010
 
 
            
Justice Johnson delivered 
the opinion of the Court.
 
            
Justice Green filed a 
concurring opinion, in which Justice 
Willett joined.
 
            
Justice Lehrmann did not 
participate in the decision.
 
            
In this case we consider whether the evidence supporting a court order 
requiring a mentally ill person to undergo mental health services is legally 
sufficient. The trial court found that K.E.W. was mentally ill and as a result 
of that mental illness was likely to cause serious harm to others, and the court 
ordered him to submit to temporary inpatient mental health services. The court 
of appeals reversed. It held there was no evidence of a recent overt act tending 
to confirm that K.E.W. was likely to cause serious harm to others. We conclude 
the evidence is legally sufficient to support the trial court’s order and 
reverse the court of appeals’ judgment. We remand to the court of appeals for 
review of K.E.W.’s factual sufficiency issues.
I. Background
            
On April 17, 2008, K.E.W., who had previously been diagnosed with 
schizophrenia and was a regular patient of the Gulf Coast Mental Health and 
Mental Retardation Center (Center), went to the Center for an appointment. While 
he was there he told his treating physician at the Center, Dr. Pugh, that he had 
been assigned to impregnate multiple women. K.E.W. would not cooperate with the 
staff. He paced around the building smoking cigarettes, stated that he wanted to 
impregnate some of the Center’s female staff, and repeatedly asked for a 
particular female employee. The staff became concerned enough about his behavior 
that they isolated the female employee. Dr. Pugh called the police because he 
believed K.E.W. might be a danger to others. K.E.W. refused to cooperate with 
the police, and they took him to the emergency room at the University of Texas 
Medical Branch at Galveston. There, K.E.W. told the treating physicians that he 
had been chosen to help populate a new and better race of humans. He said there was a group of women he planned to find 
and impregnate, including his adult step-daughter. He had written plans 
detailing his mission and papers with the names of several women whom he 
believed he needed to impregnate. He expressed his belief that some of the women 
he was seeking had been at or near the hospital when he was brought there, but 
they had departed by plane and time travel. He became agitated and angry and 
accused the hospital staff of withholding information about the women’s 
whereabouts. He insisted that he needed to leave the hospital to accomplish his 
mission.
            
The State sought court orders to commit K.E.W. for temporary mental 
health services and to administer psychoactive medication. See Tex. Health & Safety 
Code § 574.034. Section 
574.034 of the Texas Health and Safety Code is entitled “Order for Temporary 
Mental Health Services” and provides, in relevant part:
 
(a) The 
judge may order a proposed patient to receive court-ordered temporary inpatient 
mental health services only if the judge or jury finds, from clear and 
convincing evidence, that:
(1) the proposed patient is mentally ill; and
(2) as a result of that mental illness the proposed patient:
(A) is likely to cause serious harm to himself;
(B) is 
likely to cause serious harm to others; or
(C) is:
(i) suffering severe and abnormal 
mental, emotional, or physical distress;
(ii) 
experiencing substantial mental or physical deterioration of the proposed 
patient’s ability to function independently, which is exhibited by the proposed 
patient’s inability, except for reasons of indigence, to provide for the 
proposed patient’s basic needs, including food, clothing, health, or safety; 
and
(iii) unable to make a rational and informed decision as to whether 
or not to submit to treatment.
. . . .
(c) If the 
judge or jury finds that the proposed patient meets the commitment criteria 
prescribed by Subsection (a), the judge or jury must specify which criterion 
listed in Subsection (a)(2) forms the basis for the 
decision.
(d) To be 
clear and convincing under Subsection (a), the evidence must include expert 
testimony and, unless waived, evidence of a recent overt act or a 
continuing pattern of behavior that tends to confirm:
(1) the likelihood of serious harm to the proposed patient or 
others; or
(2) the proposed patient’s distress and the deterioration of the 
proposed patient’s ability to function.
 
 
Id. § 
574.034 (emphasis added).
            
At the non-jury hearing on its commitment motion, the State presented 
K.E.W.’s medical records, testimony from two Center employees, and testimony 
from two doctors who examined him at the hospital. K.E.W. presented no 
evidence.
            
The trial court committed K.E.W. to Austin State Hospital for inpatient 
care not to exceed ninety days. The court found by clear and convincing evidence 
that K.E.W. was mentally ill and as a result of that mental illness he (1) was 
likely to cause serious harm to others and (2) was suffering severe and abnormal 
mental, emotional, or physical distress; was experiencing substantial mental or 
physical deterioration of his ability to function independently, which was 
exhibited by his inability, except for reasons of indigence, to provide for his 
basic needs, including food, clothing, health, or safety; and was unable to make 
a rational and informed decision as to whether to submit to treatment. 
See 276 S.W.3d 686, 691-92.
            
Immediately following the commitment hearing, the trial court heard and 
granted the State’s application for an order to administer psychoactive 
medication. The trial court based its order on findings that K.E.W.’s mental 
illness rendered him incapable of making medical treatment decisions and that 
such treatments would be in K.E.W.’s best interest.
            
K.E.W. appealed. The court of appeals determined that the evidence was 
legally sufficient to support the trial court’s finding that K.E.W. was mentally 
ill but reversed the order for mental health services. Id. at 699-700. It 
held there was no evidence of an overt act or continuing pattern of behavior 
that tended to confirm either deterioration of K.E.W.’s ability to function 
independently, id. at 697, or that he was likely 
to cause serious harm to others. Id. at 699; see Tex. Health & Safety 
Code § 573.034(d). 
Because the order authorizing the administration of psychoactive medications 
depended on the existence of a valid order for mental health services, the court 
of appeals also reversed the order to administer psychoactive medication. 276 S.W.3d at 700.
            
We granted the State’s petition for review.
            
The State urges that the evidence was legally sufficient to support the 
trial court’s findings and orders. Specifically, it argues that (1) the court of 
appeals erred by applying an elevated standard of evidentiary review; (2) the 
evidence was legally sufficient to support the trial court’s finding that K.E.W. 
committed an overt act that tended to confirm the likelihood he would cause 
serious harm to others; and (3) because the evidence was legally sufficient to 
support the commitment order, both the trial court’s commitment order and its 
order that K.E.W. be administered psychoactive medication should be 
affirmed.
            
K.E.W. does not challenge the finding that he is mentally ill. He urges 
us to affirm the court of appeals’ decision as to the standard of review and the 
legal insufficiency of the evidence. K.E.W. agrees that disposition of the 
commitment order controls disposition of the order to administer psychoactive 
medications.
II. Discussion
A. Jurisdiction
            
The ninety-day period for which K.E.W. was ordered to receive services 
has expired. Nevertheless, we have jurisdiction. The expiration of the time for 
which he was ordered to receive services does not require the appeal to be 
dismissed for mootness. State v. 
Lodge, 608 S.W.2d 910, 912 (Tex. 1980).
 
B. Standard of Review
            
The State argues that Section 574.034’s clear and convincing evidence 
requirement does not alter the appropriate standard of review. It urges that the 
evidence was legally sufficient so long as there was more than a scintilla of 
evidence to support the trial court’s challenged finding. We disagree.
            
Clear and convincing evidence is “that measure or degree of proof which 
will produce in the mind of the trier of fact a firm 
belief or conviction as to the truth of the allegations sought to be 
established.” State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979) (per curiam). Evidence that merely exceeds a scintilla is 
not legally sufficient when the burden of proof is clear and convincing. See 
In re J.F.C., 96 S.W.3d 256, 264-65 (Tex. 2002); see also Sw. Bell Tel. 
Co. v. Garza, 164 S.W.3d 607, 627 (Tex. 2004). In evaluating evidence for 
legal sufficiency under a clear and convincing standard, we review all the 
evidence in the light most favorable to the finding to determine whether a 
reasonable factfinder could have formed a firm belief 
or conviction that the finding was true. See In re J.F.C., 96 S.W.3d at 266. We resolve disputed fact questions in favor 
of the finding if a reasonable factfinder could have 
done so, and we disregard all contrary evidence unless a reasonable factfinder could not have done so. City 
of Keller v. Wilson, 168 S.W.3d 802, 817 (Tex. 2005); In re J.F.C., 
96 S.W.3d at 266.
C. Order for Temporary Civil Commitment
1. Proof required
            
In regard to the issue urged by the State, the trial court, to commit 
K.E.W., was required to find by clear and convincing evidence that as a result 
of his mental illness, K.E.W. was likely to cause serious harm to others. Tex. Health & Safety Code § 
574.034(a)(2)(B). The statute does not prescribe what 
evidence the State must present to carry its burden, except that it must include 
expert testimony and evidence of a recent overt act that “tends to confirm the 
likelihood of serious harm to . . . others.” Id. § 574.034(d)(1). The court of appeals interpreted the latter as 
requiring evidence of “a substantial threat of harm, based on actual dangerous 
behavior, manifested by some overt act or threats in the past.” 276 S.W.3d at 695. The court further stated that evidence of 
“possible” or “potential” harm to others does not satisfy the State’s burden. 
Id. at 694. Arranging previous court of appeals’ 
cases into three categories—those involving “Per Se Overt Acts of 
Dangerousness,”[1] those involving “Ambiguous Conduct,”[2] and those involving “No Substantially 
Dangerous Conduct”[3]—K.E.W. urges the court of appeals’ 
judgment be affirmed on the basis that courts of appeals have consistently 
required an “overt act” be proven by evidence of actual harmful conduct 
demonstrating a threat of imminent harm to others. The State, on the other hand, 
urges that the statute does not require evidence of an act that either is 
actually harmful itself or that demonstrates harm to others is imminent. We 
agree with the State.
            
In construing statutes, our primary objective is to give effect to the 
Legislature’s intent as expressed in the statute’s language. Galbraith Eng’g Consultants, Inc. v. 
Pochucha, 290 S.W.3d 863, 867 (Tex. 2009). 
We rely on the plain meaning of the text unless a different meaning is supplied 
by legislative definition, is apparent from the context, or unless such a 
construction leads to absurd results. City of Rockwall v. 
Hughes, 246 S.W.3d 621, 625-26 (Tex. 2008). Language in a statute is 
presumed to have been selected and used with care, and every word or phrase in a 
statute is presumed to have been intentionally used with a meaning and purpose. 
See In re Caballero, 272 S.W.3d 595, 599 (Tex. 2008); Chastain v. 
Koonce, 700 S.W.2d 579, 582 (Tex. 1985).
            
First, we address the “overt act” requirement. The phrase is not defined 
in the Health and Safety Code. Accordingly, we read it in context and construe 
the term according to common usage. See Tex. Gov’t Code § 311.011(a). When something 
is “overt,” it is generally considered to be open and observable, rather than 
concealed or secret. See Black’s 
Law Dictionary 1137 (8th ed. 2004); Webster’s New Universal Unabridged Dictionary 
1386 (1996). And an “act” is something that is done or performed. 
See Black’s at 26; Webster’s at 19. Although this Court has not 
construed the term in the civil commitment context, courts from other 
jurisdictions have said it can include both physical acts and verbal statements. 
See, e.g., In re Mental Health of E.M., 875 P.2d 355, 356-57 
(Mont. 1994) (holding that a verbal statement of a threatening nature can 
constitute an overt act within the context of civil commitment cases). We do not 
see any indication the Legislature intended to limit the term “overt act” to 
physical conduct as opposed to any other action objectively perceptible, 
including verbal statements. Words can express intent just as physical actions 
can. For example, a person saying he is going to hit someone can reflect intent 
to do so, just as the physical act of making a fist and drawing back can reflect 
such intent. We conclude that a proposed patient’s words are overt acts within 
the meaning of Section 574.034(d). Further, when the words expressed by a person 
that has a mental illness foreshadow violence, the Legislature has permitted the 
law’s intervention to prevent serious injury to others. Stated another way, 
statements made by a proposed patient such as K.E.W. can be relevant both to 
determining whether he is mentally ill and also to predicting what actions he 
might or will take in the future as a result of his mental illness. The court of 
appeals stated that “potential” harm is not sufficient to deprive a person of 
his liberty and the threat of harm must be substantial. 276 S.W.3d at 694-95 
(citing J.M. v. State, 178 S.W.3d 185, 193 (Tex. App.—Houston [1st Dist.] 
2005, no pet.); State ex rel. L.C.F., 96 S.W.3d 651, 657 (Tex. App.—El 
Paso 2003, no pet.); In re C.O., 65 S.W.3d 175, 181-82 (Tex. App.—Tyler 
2001, no pet.); Broussard v. State, 827 S.W.2d 619, 622 (Tex. App.—Corpus 
Christi 1992, no writ) (stating that “[b]are psychiatric expert opinion of a 
‘potential danger’ to others is insufficient to support a commitment”)). Echoing 
that statement, K.E.W. argues that evidence of an overt act within the meaning 
of the statute must show a clear and present danger of imminent harm to others. 
He urges that to the extent his words can be considered evidence, the 
requirement that they show imminent harm to others accords with the United 
States Supreme Court’s holdings that speech is “protected against censorship or 
punishment, unless shown likely to produce a clear and present danger of a 
serious substantive evil that rises far above public inconvenience, annoyance, 
or unrest.” Terminiello v. City of 
Chicago, 337 U.S. 1, 4 (1949); see also Schenck 
v. United States, 249 U.S. 47, 52 (1919). K.E.W.’s argument misses the 
mark.
            
The statute does not require that the overt act demonstrate serious harm 
to others is imminent if the proposed patient is not committed; its language is 
broad enough to permit commitment even if the person’s oral threat does not 
cause physical harm.[4] Tex. Health & Safety 
Code § 574.034. Rather, 
the statute requires evidence of an overt act that “tends to confirm” the 
“likelihood” of serious harm to others. Id. § 
574.034(d). In determining the meaning of the statutory language, we 
presume its words were selected with care and used with purpose. See In re 
Caballero, 272 S.W.3d at 599. “Likelihood” connotes 
more than mere possibility or conjecture and is synonymous with “probability.” 
Webster’s at 1114; see Fibreboard Corp. v. Pool, 813 S.W.2d 658, 681 (Tex. 
App.—Texarkana 1991, writ denied).
            
Some appellate courts, including the court of appeals in this case, have 
held that the proposed patient must have engaged in “actual dangerous behavior” 
manifested by an overt act or threats. See, e.g., 276 
S.W.3d at 695 (citing J.M., 178 S.W.3d at 196; Taylor v. State, 
671 S.W.2d 535, 538 (Tex. App.—Houston [1st Dist.] 1983, no writ)). This 
proposition seems to have originated with the court of appeals’ analysis in 
Moss v. State, 539 S.W.2d 936, 948-51 (Tex. Civ. App.—Dallas 1976, no 
writ). In Moss, physicians testified that their diagnoses were based on 
statements the proposed patient made to them, but they did not reveal the 
contents of those statements or explain why they believed she was dangerous. 
Id. The Moss court stated that an order for involuntary commitment 
must be supported by the recommendation of a physician and proof of the factual 
information on which the recommendation was based. Id. 
at 950. We do not read Moss as requiring proof of a substantial 
threat of future harm founded on actual, dangerous behavior. In any event, after 
Moss was decided, the Legislature specified both the criteria by which a 
person can be ordered to submit to mental health services and certain elements 
of evidence required by the clear and convincing evidentiary standard in such 
proceedings. Act of April 20, 1983, 68th Leg., R.S., ch. 47, § 50, 1983 Tex. Gen. Laws 211, 241 (current version 
recodified at Tex. Health & Safety Code § 574.034); 
see also House Study Group, Bill 
Analysis, C.S. S.B. 435, 68th Leg., R.S., 4 (1983). The statute 
applicable to this case does not require evidence of a recent overt act that by 
itself proves the likelihood a proposed patient will cause serious harm to 
others. See Tex. Health & Safety Code § 
574.034(d). It requires only that the overt act “tends to 
confirm” the likelihood of serious harm. Id. “Tends” means “to have 
leaning,” “to contribute to,” or “have a more or less direct bearing or effect.” 
See Black’s Law Dictionary 
1507 (8th ed. 2004) (defining “tend” as to be disposed toward something; 
to serve, contribute, or conduce in some degree or way; to have more or less a 
direct bearing or effect; and to be directed or have a tendency to an end, 
object, or purpose); Webster’s at 
1955 (defining “tend” as “to be 
disposed or inclined in action, operation, or effect to do something”); see 
also Simmons v. State, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009) (stating 
that in determining whether non-accomplice evidence tends to connect a defendant 
to the offense, “the evidence must simply link the accused in some way to the 
commission of the crime and show that rational jurors could conclude that this 
evidence sufficiently tended to connect [the accused] to the offense” (quoting 
Malone v. State, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008))); Nash v. 
State, 134 S.W. 709, 717-21 (Tex. Crim. App. 1911) (defining the word “tend” 
as “[t]o stretch, extend, direct one’s course; to be directed as to any end, 
object or purpose; to aim; to have or give a leaning” and stating that “if the 
circumstances lead toward, or tend toward, the defendant as the party who 
committed the offense, and show the truth of the prosecutrix, this would be all the law required”). 
Accordingly, a recent overt act by a proposed patient “tends to confirm” that 
the patient poses a likelihood of serious harm to others within the meaning of 
Section 573.034(d) if the overt act is to some degree probative of a finding 
that serious harm is probable, even though the overt act itself may not be 
dangerous. Such a construction honors the statute’s language and the 
Legislature’s attempt to fairly balance the rights of a proposed patient, the 
difficulties in predicting future behavior of mentally ill persons, and the 
community’s interest in protection from persons who are mentally ill and who, by 
reason of their illness, may commit future harmful acts against others. See 
Addington v. Texas, 441 U.S. 418, 426-30 
(1979).
            
In sum, the statute requires evidence of a recent act by the proposed 
patient, either physical or verbal, that can be objectively perceived and that 
is to some degree probative of a finding that serious harm to others is probable 
if the person is not treated. The overt act itself need not be of such character 
that it alone would support a finding of probable serious harm to others. 
See Tex. Health & Safety 
Code § 573.034(d)(1).
            
Keeping the foregoing in mind, we next review the evidence presented at 
the commitment hearing.
2. The Commitment Hearing
            
An employee of the Gulf Coast Center testified that he was present when 
K.E.W. came to the Center on April 17, 2008. According to the employee, K.E.W. 
appeared to be extremely paranoid, was difficult to redirect, and asked numerous 
times for a certain female staff member who worked there. The staff became 
concerned enough to place the female staff member “in the back behind a closed 
door” until K.E.W. could be escorted from the Center. The employee further 
testified that K.E.W. refused to cooperate with the staff, paced around the 
building, and refused to calm down or stand still. As a result of K.E.W.’s 
behavior the police were called, but when they arrived, he still refused to 
cooperate.
            
A counselor from the Center testified that according to the medical 
records, K.E.W. said “he wanted to get some Gulf Coast Center women pregnant.” 
She testified that he was a regular patient of the Center—“[h]e is on our Ag 
team, the highest level of services you will see”—and that the Center employees 
recommended he be committed to Austin State Hospital.
            
Dr. Ortiz, one of K.E.W.’s treating psychiatrists at the hospital, 
testified that she had seen K.E.W. daily during the week preceding the hearing 
and that during his stay at the hospital he would become agitated regarding his 
belief about the women. When he was in the emergency room he was inconsolable 
because he “experienced” the knowledge that some of the women that he was 
seeking were in the emergency room, that he had just missed them, and that staff 
members in the emergency room were withholding information from him about the 
women’s whereabouts as a conspiracy to hide them from him. During the times Dr. 
Ortiz interacted with K.E.W., he became agitated, was intrusive, and “invaded 
[her] space.” There were additional times when K.E.W. became very upset because 
he believed Dr. Ortiz knew where the women were located.
            
Dr. Ortiz expressed concern about two particular behaviors of K.E.W. as a 
potential danger to others. One of the potential dangers was non-consensual 
sexual interaction with the specific women he sought. While Dr. Ortiz 
acknowledged K.E.W. did not state that he intended to impregnate anyone against 
her will and to her knowledge K.E.W. did not directly proposition a particular 
staff member or patient at the hospital, she explained that K.E.W. was very 
intrusive and she did not know, given his state of mind, if he would understand 
that “no” means “no.”
            
Dr. Stone, another of K.E.W.’s treating psychiatrists at the hospital, 
evaluated K.E.W. and stated that K.E.W. had been diagnosed with schizophrenia. 
K.E.W. told Dr. Stone on several occasions that he was on a mission to create a 
superior race, which involved tracking down and impregnating certain women. Dr. 
Stone stated that K.E.W. carried papers with him that detailed his intent to 
carry out his plans and that “there are several names that he has that he claims 
are the names of the women that he wishes to impregnate.” Dr. Stone testified 
that K.E.W. did not exhibit any threatening behavior at the hospital, but that 
because of K.E.W.’s firm belief in his delusion that he needed to locate and 
impregnate certain women, he could harm others. He opined that K.E.W. was a 
danger to this group of women and expressed concern that K.E.W. would act on his 
delusions if he found a female who he believed was promised to him. Dr. Stone 
also testified that K.E.W. is a danger to women in general because K.E.W. might 
mistake any woman for one of the women he believed was promised to him. He 
testified, “In fact on the unit we’re very careful when female medical staff go 
to talk to him to keep the door open. Not because he is homicidal, but in his 
confused belief he could believe a woman is there and someone promised to him 
that does want to be impregnated.”
            
Dr. Stone recommended that K.E.W. receive antipsychotic medication and 
treatment at Austin State Hospital.
3. Legal Sufficiency of the Evidence
            
The record demonstrates that after K.E.W. arrived for his appointment at 
the Gulf Coast Center, he stated that he wanted to “get some Gulf Coast Center 
women pregnant” and that he had an assignment to impregnate multiple women; 
vehemently insisted on contacting a certain female Center staff member; and 
interfered with female staff despite being directed otherwise.
            
After he was taken to the hospital, K.E.W. said on several occasions that 
there were women he needed to track down and impregnate. He had written plans 
detailing his mission and had several names of women he was searching for. His 
treating physicians at the hospital testified that he would become very 
agitated, intrusive, and angry regarding his beliefs, accused the hospital staff 
of conspiring against him and withholding information about the women’s 
whereabouts, and insisted that he needed to leave the hospital to accomplish his 
mission.
            
In holding that the evidence failed to establish a recent overt act that 
tended to confirm K.E.W. was likely to cause serious harm to others, the court 
of appeals relied heavily on (1) the fact that the record did not contain the 
statement K.E.W. made to the female staff member at the Gulf Coast Center who 
was then isolated by the Center staff or the specific actions taken by K.E.W. 
that made it necessary to protect her and (2) Dr. Ortiz’s testimony that K.E.W. 
had not made any sexual advances toward women at the hospital nor had he said 
that he would impregnate women against their will. 276 S.W.3d 
at 698-99. However, evidence is not legally insufficient because a fact 
might have been established by other or more evidence. In evaluating evidence 
for legal sufficiency, regardless of whether the burden of proof is by a 
preponderance of the evidence or by clear and convincing proof, all the evidence 
is reviewed in the light most favorable to the finding. See In re J.F.C., 
96 S.W.3d at 266. Disputed facts are resolved in favor 
of the finding if a reasonable factfinder could have 
done so, and all contrary evidence is disregarded unless a reasonable factfinder could not have done so. City of Keller, 
168 S.W.3d at 817; In re J.F.C., 96 S.W.3d at 
266.
            
We agree with the court of appeals that evidence of a proposed patient’s 
mental illness, without more, does not fulfill the statutory requirement for 
ordering involuntary inpatient mental health services. But K.E.W.’s statements 
fall within the kinds of overt conduct the statute’s language makes clear the 
Legislature considered relevant to a commitment determination. Thus, K.E.W.’s 
statements regarding his belief that he had an assignment to impregnate specific 
women, his statements seeking access to the Center’s female worker, the fact 
that he had written plans detailing his mission and had the names of specific 
women who he firmly believed he needed to impregnate, and his verbal insistence 
on searching for the women were all overt acts within the meaning of Section 
574.034(d). And the trial court was required to consider those acts in light of 
his particular mental illness because the statute required a finding that he was 
mentally ill and that as a result of that mental illness, he was likely 
to cause serious harm to others. See Tex. Health & Safety Code § 
574.034(a)(2).
            
To the extent the concurrence says that statements made by proposed 
patients must be evaluated in light of the particular words of the statement and 
the facts of each case, we agree. But we disagree with the proposition that a 
verbal statement alone cannot suffice as an overt act under the statute. The 
concurrence agrees only that K.E.W.’s conduct in writing down and carrying with 
him plans to complete his mission and the names of women he was assigned to 
impregnate constitutes an “overt act . . . that tends to confirm . . . the 
likelihood of serious harm to the proposed patient or others.” See Tex. Health & Safety 
Code § 574.034(d). We, 
however, believe that his verbal expression of the plan was sufficient under the 
circumstances to amount to an overt act within the meaning of the statute. 
Further, we conclude that when his statements and the other evidence are viewed 
in the light most favorable to the trial court’s findings, as they must be, 
see In re J.F.C., 96 S.W.3d at 266, there is legally sufficient evidence 
to support the findings. That is, there is legally sufficient evidence on which 
a reasonable trier of fact could have formed a firm 
belief or conviction that as a result of his mental illness, K.E.W. would likely 
cause serious harm to others and that recent objectively observable acts by 
K.E.W. tended to confirm such a finding. See id. § 
574.034(d). We sustain the State’s first issue.
D. Order to Administer Psychoactive Medication
            
After issuing the commitment order, the trial court held a hearing on and 
granted the State’s order to administer psychoactive medication. The court was 
authorized to order administration of psychoactive medication only if K.E.W. was 
under a valid order for temporary or involuntary mental health services. See 
id. § 574.106(a)(1). K.E.W. agrees that the 
disposition of the commitment order controls the order to administer 
psychoactive medications. Because we have determined that the court of appeals 
erred in reversing the trial court’s order committing K.E.W. for temporary 
involuntary mental health services, we also conclude that the court of appeals 
erred in reversing the trial court’s order that K.E.W. be administered 
psychoactive medication.
III. Conclusion
            
The evidence is legally sufficient to support the trial court’s order 
that K.E.W. be required to undergo temporary inpatient mental health services. 
We reverse the court of appeals’ judgment and remand the case to that court for 
it to consider K.E.W.’s factual sufficiency complaints and for further 
proceedings.
 
                                                                        
________________________________________
                                                                        
Phil Johnson
                                                                        
Justice
 
OPINION DELIVERED: July 2, 
2010






[1] 
State ex rel. E.E., 224 S.W.3d 791 (Tex. App.—Texarkana 2007, no pet.); 
State ex rel. D.C., No. 12-05-00138-CV, 2005 WL 3725079 (Tex. App.—Tyler 
Jan. 31, 2006, no pet.); D.M. v. State, 181 S.W.3d 903 (Tex. App.—Dallas 
2006, no pet.); In re K.S., No. 2-03-295-CV, 2004 WL 254267 (Tex. 
App.—Fort Worth Feb. 12, 2004, no pet.); In re S.E.W., Nos. 
14-02-00602-CV, 14-02-0063-CV, 2002 WL 31599910 (Tex. App.—Houston [14th Dist.] 
Nov. 21, 2002, no pet.); Goldwait v. State, 961 S.W.2d 432 (Tex. 
App.—Houston [1st Dist.] 1997, no writ); L.S. v. State, 867 S.W.2d 838 
(Tex. App.—Austin 1993, no writ); K.L.M. v. State, 735 S.W.2d 324 (Tex. 
App.—Fort Worth 1987, no writ); W.L. v. State, 698 S.W.2d 782 (Tex. 
App.—Fort Worth 1985, no writ).

[2] J.J.K. v. State, Nos. 14-03-00379-CV, 14-03-00380-CV, 2003 WL 22996950 
(Tex. App.—Houston [14th Dist.] 
Dec. 23, 2003, no pet.); G.H. v. State, 96 S.W.3d 629 
(Tex. App.—Houston [1st Dist.] 2002, no pet.); In re P.W., 801 S.W.2d 1 
(Tex. App.—Fort Worth 1990, writ denied).

[3] 
State ex rel. L.H., 183 S.W.3d 905 (Tex. App.—Texarkana 2006, no pet.); 
M.S. v. State, 137 S.W.3d 131 (Tex. App.—Houston [1st Dist.] 2004, no 
pet.); In re K.D.C., 78 S.W.3d 543 (Tex. App.—Amarillo 2002, no pet.); 
K.T. v. State, 68 S.W.3d 887 (Tex. App.—Houston [1st Dist.] 2002, no 
pet.); D.J. v. State, 59 S.W.3d 352 (Tex. App.—Dallas 2001, no pet.); 
In re C.O., 65 S.W.3d 175 (Tex. App.—Tyler 2001, no pet.); T.G. v. 
State, 7 S.W.3d 248 (Tex. App.—Dallas 1999, no pet.); Johnstone v. State, 961 S.W.2d 385 (Tex. 
App.—Houston [1st Dist.] 1997, no writ); Broussard v. State, 827 S.W.2d 
619 (Tex. App.—Corpus Christi 1992, no writ); In re J.S.C., 812 S.W.2d 92 
(Tex. App.—San Antonio 1991, no writ).

[4] 
The requirements as to danger to others posed by 
the proposed patient varies widely in other jurisdictions, with some 
jurisdictions requiring the danger to others to be imminent while others require 
the risk to be a substantial risk, a clear and present threat, likely, or a 
reasonable expectation. See, e.g., Ariz. Rev. Stat. § 36-501 (can reasonably be expected to result in 
serious physical harm); Haw. Rev. Stat. § 334-60.2 
(imminently dangerous); Iowa Code 
§ 229.1(17) (is likely to physically injure the person’s self or others); La. Rev. Stat. § 28:2(3) (reasonable expectation of substantial 
risk of physical harm); Mich. Comp. Laws § 330.1401(a) (can reasonably be expected within 
near future to cause serious injury); Minn. Stat. § 253B.02 Subd. 17(2) (presents 
a clear danger); Mont. Code § 53-21-102(7) (injury or 
imminent threat thereof); N.M. 
Stat. § 43-1-3(N) (“more likely than not that in the near future” person 
will cause harm).